## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.   13-cv-1835-RGA |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| 2WIRE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF TQ DELTA, LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANT 2WIRE, INC.'S COUNTERCLAIM III

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted *pro hac vice*)
Timothy J. Malloy (admitted *pro hac vice*)
Thomas J. Wimbiscus (admitted *pro hac vice*)
Sharon A. Hwang (admitted *pro hac vice*)
Paul W. McAndrews (admitted *pro hac vice*)
Anna M. Targowska (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

*Counsel for Plaintiff TQ Delta, LLC*

## <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ................................................................................... 2

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ......................................................................................................... 9

I.    2WIRE'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED ......................................................................... 9

    A.    Legal Standard ........................................................................................ 9

    B.    2Wire's Counterclaim III for Breach of Contract Must Be Dismissed for
Failure to State a Claim .......................................................................... 10

II.    2WIRE'S COUNTERCLAIM III SEEKS AN ADVISORY OPINION AND
SHOULD BE DIMISSED FOR LACK OF SUBJECT MATTER
JURISDICTION .......................................................................................... 16

    A.    Legal Standard ...................................................................................... 16

    B.    This Court Should Dismiss 2Wire's Counterclaim III Because Resolution
of the Counterclaim Would Serve No Useful Purpose ......................... 17

CONCLUSION ................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Apple Inc. et al. v. Motorola, Inc. et al.,* 2014 U.S. App. LEXIS 7757 (Fed. Cir. April 15, 2014).................................................................................................................... 14

*Apple, Inc. v. Motorola Mobility, Inc.,*
No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012)............. 4, 19

*Apple, Inc. v. Motorola Mobility, Inc.,*
No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854 (W.D. Wisc. Oct. 29, 2012) ................... 14

*Armstrong World Indus., Inc. by Wolfson v. Adams,*
961 F.2d 405 (3d Cir. 1992).................................................................................................. 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................................................. 10

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................................... 9, 10

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997) ................................................................................................. 7

In the Matter of Certain Elec. Devices, Including Wireless Commc'n Devices, Portable
Music and Data Processing Devices, and Tablet Computers, Inv. No. 337-TA-794, at 63
(July 5, 2013) (Final).......................................................................................................... 15

*Interdigital Communications, Inc., et al. v. Nokia Corp., et al.,*
Civil Action No. 1:13-cv-0010-RGA, 2014 U.S. Dist. LEXIS 72389 (D. Del. May 28, 2014)................................................................................................................................. 13

*Interdigital Communications, Inc., et al. v. ZTE Corp., et al.,*
Civil Action No. 1:13-cv-0009-RGA, 2014 U.S. Dist. LEXIS 72389 (D. Del. May 28, 2014)................................................................................................................................. 12

*Microsoft Corp. v. Motorola, Inc.,*
864 F. Supp. 2d 1023 (W.D. Wash. 2012) ............................................................................ 12

*Nami v. Fauver,*
82 F.3d 63 (3d Cir. 1996)...................................................................................................... 12

*Pension Benefit Guaranty Corp. v. White Consolidated Indus.,*
998 F.2d 1192 (3d. Cir. 1993) ................................................................................................ 7

*Step-Saver Data Sys., Inc. v. Wyse Tech.,*
912 F.2d 643 (3d Cir. 1990)................................................................................................... 16

*Victaulic Co. v. Tieman,*
499 F.3d 227 (3d Cir. 2007)................................................................................................... 10

*Willow Bay Assoc. v. Zannett Sec. Corp.,*
C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426 (D. Del. Mar. 21, 2003) ........................... 7

**Statutes**

19 U.S.C. § 1337 ................................................................................................ 15

19 U.S.C. § 1337(d) ........................................................................................... 13

35 U.S.C. § 283 ............................................................................................. 2, 13

**Other Authorities**

Common Patent Policy for ITU-T/ITU-R/ISO/IEC (2014) ................................. 7, 8, 10

Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005) .............................. 8

**Rules**

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 9

**Regulations**

*Patent Challenges for Standard-Setting in the Global Economy*
    Washington, DC: The National Academies Press, 2013 ........................................ 11

## NATURE AND STAGE OF PROCEEDINGS

On November 4, 2013, Plaintiff, TQ Delta, LLC ("Plaintiff" or "TQD"), filed a complaint against Pace Americas, Inc. alleging infringement of 19 U.S. patents. D.I. 1.  On November 20, 2013, TQD filed a First Amended Complaint adding five additional patents.  D.I. 6.  All of the asserted patents relate to digital subscriber line ("DSL") technology, which is used to provide, e.g., high-speed broadband Internet access and video services via copper wires of a local telephone network.  *Id.* ¶ 7-8.

TQD moved for leave to amend its First Amended Complaint on January 30, 2014 to reflect a name change by Pace Americas, Inc. and to add 2Wire, Inc. and Pace plc as named Defendants in view of declaration evidence provided by the Defendant about its corporate structure. D.I. 19.  On February 7, 2014, the Court granted TQD's Motion for Leave, thereby allowing TQD to file its Second Amended Complaint to reflect the new Defendants.  TQD filed its Second Amended Complaint on the same day.  In view of the new pleading, the Court dismissed the pending Motion to Dismiss the First Amended Complaint (D.I. 11) as moot.

On March 13, 2014, Pace plc and 2Wire filed a Motion To Dismiss The Second Amended Complaint In Its Entirety, To Dismiss Plaintiff's Claims Of Indirect Infringement, To Dismiss Plaintiff's Claims For Injunctive Relief, And For A More Definite Statement. D.I. 33. On April 30, 2014, the Court granted the motion as it related to TQD's claims for indirect infringement, denied the Defendants' motion to dismiss TQD's claims for injunctive relief, denied Pace plc's motion to dismiss TQD's claims for direct infringement, and held in abeyance Pace plc's motion to dismiss for lack of personal jurisdiction pending the completion of jurisdictional discovery.   D.I. 43.   On June 2, 2014, 2Wire filed its Answer, Affirmative Defenses, And Counterclaims To Second Amended Complaint For Patent Infringement.  D.I. 44.

On June 24, 2014, TQD filed a motion (still pending) for leave to amend the Second Amended Complaint to address the perceived-shortcomings with its allegations of indirect infringement. D.I. 48.  By this motion, TQD respectfully requests the Court to dismiss 2Wire's Counterclaim III, which seeks entry of a judgment that TQD is liable for breach of contract and "decreeing that 2Wire is entitled to license any and all patents that fall within TQD's commitments to the ITU in relation to DSL-related technology, on a fair and nondiscriminatory basis on reasonable terms and conditions."  D.I. 44 at p. 29.

## SUMMARY OF ARGUMENT

1.      2Wire's Counterclaim III should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  2Wire is not entitled to the benefits of TQD's agreement with the ITU (standard setting body for relevant DSL standards). Consistent with ITU patent policy, TQD and its predecessor, Aware, Inc., agreed that it would be "willing to negotiate licenses" with an "unrestricted number of applicants" on reasonable and non-discriminatory ("RAND") terms and conditions with respect to "implementations" of any standard essential claim ("SEC").  Because 2Wire did not plead (1) that it was an "applicant" for a license (presumably because it did not apply for a license), (2) that it was "willing to negotiate for a license" (presumably because it demonstrated an unwillingness to negotiate in good faith), and (3) that any of its products constitute an "implementation" of any SEC of any asserted patent, 2Wire has failed to plead facts showing that it is entitled to the benefit of TQD's agreement with the ITU.   2Wire does not even allege that it is willing to accept a license, much less that it has applied for one.  Accordingly, 2Wire's Counterclaim III should be dismissed because it fails to state a claim for breach of contract.

2.      2Wire's Counterclaim III should also be dismissed insofar as it relies on TQD's request for injunctive relief as the basis for an alleged breach of contract.  As explained above, 2Wire has not even alleged facts that would demonstrate its entitlement to a license to the asserted patents.  In patent cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  2Wire does not cite any binding authority, nor any language from TQD's actual agreement with the ITU that precludes TQD from seeking an injunction in response to an unwilling licensee's infringement.

3.      2Wire's Counterclaim III should also be dismissed pursuant to Fed. R. Civ. P 12(b)(1) for lack of subject matter jurisdiction because 2Wire has not agreed to be bound by any adjudicated or offered RAND rate.  In an allegation pled in the alternative, 2Wire's Counterclaim III "seeks an award of specific performance requiring TQD to submit to 2Wire a license offer that is capable of acceptance by 2Wire for a license on FRAND terms and conditions determined by the Court for the Asserted Patents."  In addition, 2Wire requests "[i]n the event that the Court does not order TQ Delta to make 2Wire an offer capable of acceptance for a license to the Asserted Patents on FRAND terms, 2Wire seeks an award of specific performance requiring TQD to submit to 2Wire a license offer that is capable of acceptance by 2Wire for a license on FRAND terms and conditions determined by the Court for TQD's portfolio of United States patents that TQD had alleged are essential to ITU standards."  But, in addition to 2Wire's failure to plead conditions precedent to qualifying as a beneficiary to TQD's agreement with the ITU (e.g., that (1) it is an "applicant" for a RAND license and (2) its products are an "implementation" of any SEC), 2Wire did not plead that it would accept a license on the offered RAND terms.  2Wire's failure to state that it unconditionally agrees to be bound by an offered or

adjudicated RAND rate, means that it is requesting the Court to provide an advisory opinion on RAND license terms.  Accordingly, Counterclaim III should be dismissed for lack of subject matter jurisdiction.  *See, e.g., Interdigital Communications, Inc., et al. v. ZTE Corp., et al.,* Civil Action No. 1:13-cv-0009-RGA, 2014 U.S. Dist. LEXIS 72389 (D. Del. May 28, 2014) (dismissing breach of contract counterclaims for lack of subject matter jurisdiction); *Apple, Inc. v. Motorola Mobility, Inc.,* No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012) (dismissing Apple's breach of contract claims and refusing request that the court set a RAND rate because Apple failed to unconditionally agree accept a license on terms set by the court.).

## STATEMENT OF FACTS

TQD owns a portfolio of patents that generally relate to DSL technology.  D.I. 24 at ¶ 9. This technology is used to provide, for example, high-speed broadband Internet access via copper wires of a local telephone network.  *Id.* at ¶ 10.  More recently, DSL technology has been used by telephone carriers to deliver video services to subscribers.  *Id.*  Inventors of the patents at issue in this case have been substantial contributors of valuable technology to various DSL-related standards on behalf of TQD and its predecessor-in-interest, Aware, Inc., a world-leading innovator and provider of DSL technologies.  *Id.* at ¶ 11.  At least some of the claims of TQD's asserted patents may be SECs, i.e., essential for practicing certain DSL-related standards.  *See id.* at ¶ 15.

2Wire makes, uses, sells, offers for sale, and/or import customer premise equipment ("CPE") products, including without limitation gateways, that operate in accordance with various DSL-related standards ("DSL CPE Products").  *See id.* at ¶ 12.

As recited in TQD's Second Amended Complaint[1], TQD attempted to negotiate a license to TQD's patents with 2Wire, including a license to any to SECs consistent with ITU policy:

13. TQ Delta attempted to negotiate a license with Defendants under TQ Delta's DSL patent portfolio. On July 15, 2013, TQ Delta sent a first letter to Defendants, including an overview of TQ Delta's DSL patent portfolio and an invitation to open licensing discussions. TQ Delta requested Defendants' response by July 31, 2013.

14. Having received no response by July 31, 2013, TQ Delta sent a follow-up letter to Defendants on August 6, 2013, which requested Defendants' response by August 23, 2013.

15. Having received no response, on August 23, 2013, TQ Delta sent a follow-up email to Defendants and again invited Defendants to engage in licensing discussions. This email further explained that "the use of one or more patent claims in [TQ Delta's DSL patent] portfolio may be required to practice or otherwise comply with certain DSL-related Recommendations, Deliverables, and/or standards" and that "TQ Delta is willing to negotiate a license with Pace on a non-discriminatory basis on reasonable terms and conditions with respect to any such standard-essential patent claims."

16. TQ Delta made a good-faith effort to negotiate a license with Defendants under TQ Delta's DSL patent portfolio but those efforts were frustrated by Defendants' delay and refusal to enter into an agreement with reasonable terms that would have allowed the parties to attempt to resolve their dispute outside the context of litigation.

17. Defendants have never applied for a license under TQ Delta's DSL patent portfolio.

D.I. 24 at ¶¶ 13-17.

Despite TQD's repeated good-faith efforts to negotiate a license under TQD's DSL patent portfolio, 2Wire failed to engage in timely, good-faith negotiations. Importantly, 2Wire admits that it never applied for a license under TQD's DSL patent portfolio. D.I. 44, Answer at ¶

---

[1] TQD is referencing its Second Amended Complaint because it has not been granted leave to file its Third Amended Complaint. The respective allegations of the Second and Third amended complaints, however, are the same in relevant respects to this motion.

17 ("2Wire admits that it has not 'applied for a license under TQ Delta's DSL patent portfolio.'"). TQD was left with no choice but to initiate the current suit.

2Wire's Counterclaim III, purportedly for "Breach of Contract," alleges that "TQD was contractually obligated, among other things, to grant licenses to its identified patents consistent with the applicable patent policy of the standards and bylaws of the ITU." D.I. 44 at ¶ 28.   In support of Counterclaim III, 2Wire also alleges that "TQ Delta breached its contractual commitments when it (i) failed to grant any necessary licenses to 2Wire on FRAND terms and conditions; (ii) failed to seek a determination of FRAND license terms and conditions from a competent court or tribunal; and (iii) prosecuted this infringement action seeking a permanent injunction."[2]  *Id.* at ¶ 29.   2Wire further alleges that TQD breached an alleged contractual obligation by "seeking to enjoin 2Wire's implementation of the technology of the allegedly 'essential' patents."  *Id.* at ¶ 30.

2Wire's Counterclaim III seeks an award of "specific performance requiring TQD to submit to 2Wire a license offer that is capable of acceptance by 2Wire for a license on FRAND terms and conditions determined by the Court for the Asserted Patents."  *Id.* at ¶ 34.  2Wire also alternatively seeks an award of "specific performance requiring TQD to submit to 2Wire a license offer that is capable of acceptance by 2Wire for a license on FRAND terms and conditions determined by the Court for TQD's portfolio of United States patents that TQD has alleged are essential to ITU standards."  *Id.* at ¶ 35.

---

[2] The terms FRAND and RAND are used interchangeably in addressing licensing terms for standards-essential patents.  The "F" in FRAND adds the word "Fair" to "Reasonable And Non-Discriminatory."

2Wire's counterclaims purport to be based on agreements TQD/Aware made with the ITU, and on unspecified policies and bylaws of the ITU.[3]  The actual agreements TQD/Aware made with the ITU are expressed in documents submitted to the ITU by TQD/Aware, which are referred to as a Patent Statement and Licensing Declaration ("Patent Declaration").  An example of a Patent Declaration submitted by Aware to the ITU, the relevant wording of which is representative of all such Patent Declarations submitted by TQD/Aware, is submitted herewith as Exhibit A to the Declaration of Paul McAndrews (the "McAndrews Declaration").  The Common Patent Policy for ITU-T/ITU-R/ISO/IEC ("ITU Patent Policy") is submitted herewith as Exhibit B to the McAndrews Declaration.

TQD's Patent Declaration provides that TQD is "<u>willing to negotiate</u>" a license to its SECs on RAND terms:

> In accordance with [ITU Patent Policy], Aware is not prepared to waive its patent rights but would be **<u>willing to negotiate</u>** with other parties on a non-discriminatory basis on reasonable terms and conditions with respect to patent claims held or controlled by Aware that are essential for compliance on a technological basis with [listed DSL standards].

---

[3] Because 2Wire's pleading relies exclusively on such agreements and patent policies, the Court should consider these documents in ruling on this Motion to Dismiss, despite the fact that they are outside the four corners of 2Wire's Counterclaims.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'  '[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'") (internal citations omitted); *Pension Benefit Guaranty Corp. v. White Consolidated Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *see also Willow Bay Assoc. v. Zannett Sec. Corp.*, C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426, at *4-5 (D. Del. Mar. 21, 2003).

McAndrews Decl., Ex. A at A-1 (emphasis added); *see also id.,* Ex. B at § 2.2 ("The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions").   TQD's Patent Declaration further provides that TQD is "prepared to grant" a license to its SECs on RAND terms to an "applicant" that seeks a license for "implementations" of the particular DSL standard:

> The Patent Holder is **prepared to grant** a license to an unrestricted number of **applicants** on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell **implementations** of the [specified DSL standard].

McAndrews Decl. at A-3 (emphasis added).   Thus, the express language of the Patent Declaration only requires TQD to participate in good-faith negotiations (i.e., be "willing to negotiate" and "prepared to grant" a license) with a party who has requested a license (i.e., an "applicant").   Further, TQD only is required to negotiate a RAND license for products that comply with the DSL standard(s) (i.e., "implementations") for which TQD's claims are essential. A party whose products do not comply with the DSL standard(s)[4] to which TQD's SECs apply is not entitled to a RAND license.

The Patent Declaration further indicates that parties are to engage in good-faith negotiations where the ITU plays no role in the negotiations:

> **Negotiations** are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.

*Id.* (emphasis added).

---

[4] 2Wire generally admitted that its gateway products operate in accordance with "certain standards," but omitted the term "DSL-related" that had appeared in the Second Amended Complaint in its qualified admission.  D.I. 24, Answer, at ¶ 12 (emphasis added).  However, in each instance where 2Wire responded to an allegation that certain of its products operated in accordance with a specific DSL standard, it denied the allegation.  *Compare*, *e.g.*, D.I. 24 at ¶ 20 *with* D.I. 44, Answer at ¶ 20.

The ITU Patent Policy recognizes that the appropriate RAND terms and royalty rate cannot be set in a vacuum outside the case-by-case context of specific negotiations between the patent holder and license applicant:

> The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might **differ from case to case**.

McAndrews Decl., Ex. B at p. 1 (emphasis added).  The ITU provides the following explanation for staying out of negotiations between the patent holder and prospective licensee:

> … standardization organizations will most probably not be in a position to act as genuine arbitrators in patent rights disputes, for the simple reason that the disputing patent rights holders will never disclose all the information they need to act as a fair judge in a patent rights controversy.  For example, **in order to define what is fair and "reasonable" in a given case, one needs to know development and manufacturing costs, profits, etc.**  This kind of information is normally not disclosed to a third party with which no legal relationship has been established, as would be the case for a standardization organization vis-à-vis its member organizations.

McAndrews Decl., Ex. C (Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005) at § 2.3 (emphasis added).  These policies are inconsistent with 2Wire's assertion that TQD was required to provide it with a FRAND offer in the absence of 2Wire's good-faith participation in negotiations.  *See* D.I. 44, Counterclaims at ¶¶ 12-13, 26-29, and 34-35.

## ARGUMENT

### I.     2WIRE'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

#### A.     Legal Standard

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.* at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557 (2007)).  In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts in the pleading that "raise a right to relief above the speculative level."  *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007).

**B.**   **2Wire's Counterclaim III for Breach of Contract Must Be Dismissed for Failure to State a Claim**

**1.**   **2Wire fails to plead facts showing that it is entitled to the benefit of a RAND license**

2Wire's breach of contract counterclaim fails to plead facts sufficient to show that it is entitled to the benefits of TQD's agreement with the ITU.  2Wire's Counterclaim III is based on 2Wire's incorrect belief that TQD was obligated to provide it with a "FRAND offer" (and do so even in the absence of 2Wire's request for a license and good-faith participation in negotiations). *See* D.I. 44, Counterclaims at ¶¶ 12-13, 26-29, and 34-35.  Contrary to 2Wire's assertions, TQD's Patent Declaration only requires that TQD be "willing to negotiate" and "prepared to grant" a license to its SECs on RAND terms to an "applicant" that seeks a license.  *See* McAndrews Decl., Ex. A at A-1, A-3.

2Wire does not deny that TQD repeatedly contacted 2Wire prior to filing suit.  *Compare* D.I. 24 at ¶¶ 13-15 with D.I. 44, Answer at ¶¶ 13-15.  Nor does 2Wire deny that TQD stated that it was "willing to negotiate a license with 2Wire on a nondiscriminatory basis on reasonable terms and conditions with respect to any such standard essential patent claims."  *Compare* D.I. 24 at ¶ 15 with D.I. 44, Answer at ¶ 15.  As for 2Wire's response to TQD's efforts, nowhere does 2Wire plead facts showing that is was willing to negotiate, that it applied for a license, or that it would be willing to unconditionally accept a license to TQD's SECs on RAND terms.

10

Instead, 2Wire's counterclaims are based on the incorrect premise that TQD was obligated to provide it with a FRAND offer (*see* D.I. 24, Counterclaims at ¶¶ 12-13, 26-29, and 34-35)—even in the absence of good-faith negotiation by 2Wire.  As the Patent Declaration and ITU Patent Policy recognizes, absent good-faith participation in negotiations by the prospective licensee, including the exchange of relevant information such as sales data, revenues, costs, profits, etc., the patent owner cannot be expected to propose terms in a vacuum.  *See* McAndrews Decl., Ex. A at A-3 ("Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC."); Ex. B at p. 1 ("The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case.); and Ex. C at § 2.3 ("In order to define what is fair and 'reasonable' in a given case, one needs to know development and manufacturing costs, profits, etc.").

The RAND commitment attempts to strike a balance between two parties, namely: (1) innovators and patent holders that should be fairly compensated so they are encouraged to innovate and voluntarily contribute their technology to a standard; and (2) implementers that benefit from the sale of standards-compliant products.  For this process to work, <u>the potential licensee must actually apply for (hence the term "applicants"), and be willing to engage in good-faith negotiations to enter into, a license on RAND terms</u>.

In a recent case involving SECs and RAND issues, Intel argued that Ericsson breached its RAND obligations by refusing to offer Intel a license on RAND terms.  The court rejected Intel's claim of breach of contract, noting that Intel had failed to engage in good faith negotiations with Ericsson.  *See Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585, at *58 (E.D. Tex. Aug. 6, 2013) (holding that "Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer."); *see also Microsoft*

11

*Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (holding that "the implied duty of good faith and fair dealing inherent in every contract" applies to RAND negotiations) (citation omitted); National Research Council *Patent Challenges for Standard-Setting in the Global Economy: Lessons from Information and Communication Technology*. Washington, DC: The National Academies Press, 2013 (describing a FRAND commitment as mutual in the sense that "[b]oth the SEP holder and any prospective licensee are expected to negotiate in good faith towards a license on reasonable terms and conditions that reflect the economic value of the patented technology."), attached as Ex. D to the McAndrews Decl.

2Wire only makes a vague generalization that, "[w]hen a patentee voluntarily commits to allow manufacturers <u>willing to take a license</u> on FRAND terms[,] . . . it . . . creates enforceable contractual obligations and rights." D.I. 44 at ¶ 13 (emphasis added). Importantly, however, 2Wire fails to plead that it is or ever was such a willing licensee, much less that it has "applied" (i.e., is an "applicant"), and will thus *unconditionally* agree to accept a RAND license.[5] This Court recently, in dismissing similar RAND-based counterclaims, recognized the futility of setting RAND terms under such circumstances in *Interdigital Communications, Inc., et al. v. ZTE Corp., et al.,* Civil Action No. 1:13-cv-0009-RGA, 2014 U.S. Dist. LEXIS 72389 (D. Del. May 28, 2014), noting "[a]ll the Court's determination of a FRAND rate would accomplish would be to give a data point from which the parties could continue negotiations."[6]   *Id.* at p. 6.

---

[5] Although 2Wire asserts that TQD did not attempt to negotiate in good faith because TQD did not provide 2Wire with a FRAND offer (i.e., specific financial terms for a license), the contract upon which 2Wire's assertion relies does not require such an offer. A court need not accept factual allegations that are "self-evidently false." *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

[6] The opinion grants Interdigital's Motion to Dismiss ZTE's Counterclaims and those of Nokia Corp. and other defendants, in the related case *Interdigital Communications, Inc., et al. v. Nokia*

In that case, the defendants had gone a step further than 2Wire by expressing a "willingness" to accept a license. *Id.* Yet, as this Court stated, "even if the Court were able to determine the FRAND rate in an efficient manner, . . . , the Court's FRAND finding would have little utility and serve little to no useful purpose." *Id.* In its Counterclaim III, 2Wire seeks precisely the type of data point for negotiations that this Court stated would serve no useful purpose.

Having failed to plead that it is an "applicant," or that its products "implement" the standard, 2Wire has not pled predicate facts showing that it is a beneficiary of, or entitled to enforce, TQD's contract with the ITU. Accordingly, 2Wire's breach of contract claim should be dismissed.

### 2. TQD may seek injunctive relief against 2Wire given 2Wire's unwillingness to apply for and negotiate a RAND License

2Wire's Counterclaim III also fails to state a claim upon which relief can be granted insofar as it is based on the incorrect assumption that TQD is precluded from seeking an injunction against an unwilling licensee.

In patent cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The Federal Circuit recently rejected the 2Wire's argument that patentees are categorically forbidden from receiving an injunction for standard essential patents, stating:

> To the extent that the district court applied a per se rule that injunctions are unavailable for SEPs, it erred. . . . A patentee subject to FRAND commitments may have difficulty establishing irreparable harm. On the other hand, an injunction may be justified where an infringer unilaterally refuses a FRAND

*Corp., et al.*, Civil Action No. 1:13-cv-0010-RGA, 2014 U.S. Dist. LEXIS 72389 (D. Del. May 28, 2014).

> royalty or unreasonably delays negotiations to the same effect. *See, e.g.*, U.S.
> Dep't of Justice and U.S. Patent and Trademark Office, *Policy Statement on
> Remedies for Standard-Essential Patents Subject to Voluntary F/RAND
> Commitments*, at 7-8 (Jan. 8, 2013).

*Apple Inc. et al. v. Motorola, Inc. et al.,* Nos. 2012-1548 and 2012-1549, 2014 U.S. App. LEXIS

7757, at *105-06 (Fed. Cir. April 15, 2014) (emphasis added).  Similarly, in an earlier, related

proceeding, the Western District of Wisconsin addressed whether an owner of a standard-

essential patent may seek to enjoin an infringer that refuses to negotiate in good faith.  *See Apple,

Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854 (W.D. Wisc.

Oct. 29, 2012).  That court found that "[n]one of [the patent policies of the ETSI and IEEE

standards bodies] expressly precludes Motorola or any patent owner from pursuing an injunction

or other relief as a remedy for infringement." *Id.*, 2012 U.S. Dist. LEXIS 181854, at *44; *id.* at

*46 ("[I]n light of the fact that patent owners generally have the right to seek injunctive relief

both in district courts, 35 U.S.C. § 283, and in the International Trade Commission, 19 U.S.C. §

1337(d), I conclude that any contract purportedly depriving a patent owner of that right should

clearly do so.  The contracts at issue are not clear.  Therefore, I conclude that Motorola did not

breach its contracts simply by requesting an injunction and exclusionary order in its patent

infringement actions.").  In the present case, 2Wire has not and cannot point to any ITU policy

precluding an injunction against a party who has not applied for and agreed to be bound by a

RAND license.

Commentators have also recognized the public policy concern that arises from "reverse hold-up"—when an infringer uses standard-essential technology without compensation to the patent owner under the guise that an offer to licenses was not made under RAND terms.  As aptly stated by the ITC:

> Apple's position illustrates the potential problem of so-called reverse patent hold-up, a concern identified in many of the public comments received by the Commission. <u>In reverse patent hold-up, an implementer utilizes declared-essential technology without compensation to the patent owner under the guise that the patent owner's offers to license were not fair or reasonable. The patent owner is therefore forced to defend its rights through expensive litigation.</u> In the meantime, the patent owner is deprived of the exclusionary remedy that should normally flow when a party refuses to pay for the use of a patented invention.

McAndrews Decl., Ex. E; *In the Matter of Certain Elec. Devices, Including Wireless Commc'n Devices, Portable Music and Data Processing Devices, and Tablet Computers*, Inv. No. 337-TA-794, at 63 (July 5, 2013) (Final).

Recognizing the reverse hold-up problem, the Department of Justice ("DOJ") issued a "Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments."  McAndrews Decl., Ex. F.  The DOJ recognized that injunctive relief may be appropriate for infringement of standard-essential patents that are encumbered by a RAND commitment where an infringer refuses to engage in negotiations or pay what has been determined to be a RAND rate:

> An exclusion order may still be an appropriate remedy in some circumstances, such as where the putative licensee is unable or refuses to take a F/RAND license and is acting outside the scope of the patent holder's commitment to license on F/RAND terms.  For example, <u>if a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate.</u> Such a refusal could take the form of a constructive refusal to negotiate, such as by insisting on terms clearly outside the bounds of what could reasonably be considered to be

F/RAND terms in an attempt to evade the putative licensee's obligation to fairly compensate the patent holder.

*Id.* at p. 7 (emphasis added; footnotes omitted).[7]

As discussed above, the pleadings themselves show that 2Wire never requested a license under TQD's patents—and, in fact, refused multiple offers from TQD to engage in negotiations for such a license. There is nothing in the language of TQD's Declaration or the ITU Patent Policy that precludes TQD from seeking an injunction under such circumstances. *See* McAndrews Decl., Exs. A-C. Nor did 2Wire ever allege (nor can it allege) any affirmative action by TQD to waive its right to enjoin infringers of its patented technology, particularly where, as here, the infringer refuses to enter into good-faith negotiations for a license. In such situations, a patentee is allowed to seek injunctive relief to prevent and deter reverse patent hold-up by unwilling licensee infringers. Accordingly, 2Wire's breach of contract counterclaim should be dismissed for this reason as well.

## II.   2WIRE'S COUNTERCLAIM III SEEKS AN ADVISORY OPINION AND SHOULD BE DIMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

### A.   Legal Standard

A declaratory judgment action may not move forward unless there is subject matter jurisdiction. *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646 (3d Cir. 1990). The Third Circuit has focused its inquiry as to whether subject matter jurisdiction exists on three basic principles, namely (1) "adversity of the interest of the parties," (2) "conclusiveness of the judicial judgment," and (3) "the practical help, or utility, of that judgment." *Id.* at 647. As to the

---

[7] The DOJ's Policy Statement states that, "[a]lthough the focus of the present policy statement is on exclusion orders issued pursuant to 19 U.S.C. § 1337, similar principles apply to granting of injunctive relief in U.S. federal courts …." *Id.* at n. 1.

practical help or utility inquiry, the Third Circuit has held that a court must be "convinced that by its action a useful purpose will be served." *Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992).

>       **B.   This Court Should Dismiss 2Wire's Counterclaim III Because Resolution of the Counterclaim Would Serve No Useful Purpose**

2Wire's Counterclaim III also seeks and advisory opinion and should, therefore, be dismissed for lack of subject matter jurisdiction.  In particular, 2Wire demands an award of specific performance requiring TQD to make 2Wire a license offer for a license on FRAND terms for the Asserted Patents and, alternatively, for patents that TQD alleges "are essential to ITU standards."  D.I. 44, Counterclaims at ¶¶ 34-35.  Inherent in 2Wire's demand is that the Court must determine what constitutes proper FRAND license terms and conditions, even though 2Wire has not requested a license or agreed unconditionally to accept a license on terms set by the Court.

As noted above, TQD's Patent Declaration and the ITU Patent Policy require a patent holder and a party requesting a license to essential claims to enter into good-faith negotiations. If those negotiations fail, there may then be a justiciable controversy between the parties, at which time the alleged infringer may seek specific performance of the patent holder's RAND obligations.  But, in order for such a justiciable controversy to exist, <u>the alleged infringer must be willing to accept a license on the adjudicated terms</u>.  Otherwise, such an adjudication would amount to an advisory opinion that the infringer would likely use as a "ceiling" in continued negotiations.

Rendering an advisory opinion setting FRAND license terms as demanded by 2Wire would be an enormous waste of judicial resources or, as this Court recently noted, "the Court's FRAND finding would have little utility and serve little to no useful purpose."  *Interdigital*

*Communications, Inc., et al. v. ZTE Corp., et al.,* Civil Action No. 1:13-cv-0009-RGA, 2014 U.S. Dist. LEXIS 72389, at \*10 (D. Del. May 28, 2014).   Indeed, "[a]ll the Court's determination of a FRAND rate would accomplish would be to give a data point from which the parties could continue negotiations." *Id.*, 2014 U.S. Dist. LEXIS 72389, at \*9-10.

This Court  described the folly of such an exercise:

> First, the Court would have to determine an appropriate FRAND rate in order to determine whether a FRAND offer had been made, which as discussed above, would not serve any useful purpose.  Second, the Court would need to determine whether such offer was actually made.  Similar to the determination of the FRAND rate itself, the only purpose of this would be to alter the current negotiating power between the parties.

*Id.*, 2014 U.S. Dist. LEXIS 72389, at \*10-11.

As discussed below, setting FRAND terms would also inevitably lead to terms that would not fairly compensate the patent holder, i.e., a "sub-RAND" royalty rate.  This issue was also recently raised in the aforementioned dispute between Apple and Motorola, in which Apple requested a declaratory judgment setting a RAND rate for certain Motorola standard-essential patents.  The court dismissed Apple's claims on the eve of trial because Apple would not agree to accept a license at the RAND rate set by the court:

> [I]t has become clear that Apple's interest in a license is qualified.  In its response to Motorola's motion for clarification on the specific performance issue, Apple states that it will not commit to be bound by any FRAND rate determined by the court and will not agree to accept any license from Motorola unless the court sets a rate of $1 or less for each Apple phone.  In other words, if Apple is unsatisfied with the rate chosen by the court, it "reserves the right to refuse and proceed to further infringement litigation."
>
>                                  \* \* \*
>
> I questioned whether it was appropriate for a court to undertake the complex task of determining a FRAND rate if <u>the end result would be simply a suggestion that could be used later as a bargaining chip between the parties</u>.  Apple responded that the rate would resolve the dispute in this particular case, namely, whether Motorola's license offer was FRAND and if not, what the rate should have been.

> Apple's response was not satisfactory and <u>did not assuage my concerns about determining a FRAND rate that may be used solely as a negotiating tool between the parties</u>.   After further consideration, I believe it would be inappropriate to grant Apple's clarified request for specific performance. As I explained in the October 29 order, the normal remedy for a breach of contract is an award of damages, while specific performance is an "exceptional" remedy.

*Apple, Inc.,* 2012 U.S. Dist. LEXIS 157525, at *6-7 (W.D. Wisc. Nov. 2, 2012) (internal citations omitted).

There is no dispute that 2Wire has not pled that it has products that implement the standard and that it unconditionally agrees to accept a license on the RAND terms that it asks the Court to declare.  Unless and until 2Wire unconditionally agrees to be bound by the adjudicated RAND terms, the requested RAND determination would be strictly advisory and a waste of time and resources.  Such an advisory opinion would also unduly prejudice TQD's ability to obtain fair and reasonable compensation for its inventive contributions to valuable DSL standards. 2Wire's Counterclaim III should, therefore, be dismissed for lack of subject matter jurisdiction.

## **CONCLUSION**

For the reasons set forth above, TQD respectfully requests that the Court grant its motion and dismiss 2Wire's Counterclaim III.

DATED:  June 26, 2014                    Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, Delaware  19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted *pro hac vice*)
Timothy J. Malloy (admitted *pro hac vice*)
Thomas J. Wimbiscus (admitted *pro hac vice*)
Sharon A. Hwang (admitted *pro hac vice*)
Paul W. McAndrews (admitted *pro hac vice*)
Anna M. Targowska (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois  60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

*Counsel for Plaintiff TQ Delta, LLC*