

November 7, 2018

**VIA ELECTRONIC DELIVERY**

Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
Farnan LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801

Peter J. McAndrews, Esquire
Thomas J. Wimbiscus, Esquire
McAndrews, Held & Malloy LTD.
500 West Madison Street
Chicago, Illinois  60661

Jody Barillare, Esquire
Morgan Lewis & Bockius LLP
1007 N. Orange Street, Suite 501
Wilmington, Delaware  19801

Kenneth L. Dorsney, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801

Brett Schuman, Esquire
Rachel M. Walsh, Esquire
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, California  94111

David A. White
Partner
T. 302-984-6370
F. 302-691-1136
dwhite@mccarter.com

McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801-3717
T. 302.984.6300
F. 302.984.6399
www.mccarter.com

BOSTON

HARTFORD

STAMFORD

NEW YORK

NEWARK

EAST BRUNSWICK

PHILADELPHIA

WILMINGTON

WASHINGTON, DC

Re:  ***TQ Delta, LLC v. 2Wire, Inc.***
     Civil Action No. 13-1835-RGA
     ***TQ Delta, LLC v. Zyxel Communications, Inc., et al.***
     Civil Action No. 13-2013 RGA
     ***TQ Delta, LLC v. ADTRAN, Inc.***
     Civil Action Nos. 14-954 RGA, 15-121 RGA

Dear Counsel:

This letter shall serve as my decision and order concerning the Motion of Plaintiff 2Wire, Inc. to Compel Discovery (the "Motion").

## BACKGROUND

A discovery dispute has arisen between Plaintiff TQ Delta, LLC ("TQ Delta") and various defendants concerning the sufficiency of TQ Delta's

November 7, 2018
Page 2

document production and the questioning of witnesses at depositions, which prompted counsel for TQ Delta to contact the Special Master on September 27, 2018. The Special Master held a teleconference on October 1, 2018 and the parties agreed to a briefing schedule. On October 5, 2018, Defendant 2Wire, Inc. ("2Wire") filed the Motion. TQ Delta submitted its response in opposition to the Motion on October 12, 2018 (the "Opposition"). On October 22, 2018, 2Wire submitted a reply in support of the Motion (the "Reply"). Defendants Zyxel Communications, Inc. and ADTRAN, Inc. subsequently joined in the Motion (the "Joinder").[1] The Special Master held oral argument on October 30, 2018 ("Oral Argument").[2]

As set forth in the Motion, 2Wire challenges: (1) the sufficiency of TQ Delta's document production; (2) the redaction of time entries on invoices; (3) the assertion of legal privilege by TQ Delta as to certain areas of questioning at the depositions of (a) Michael Tzannes, (b) Rule 30(b)(6) corporate designee Mark Roche, (c) Rule 30(b)(6) corporate designee Abha Divine, (d) Marcus Tzannes, and (e) Bruce Bernstein; and (4) the propriety of TQ Delta's remarks regarding its intention to seek a protective order. Finally, 2Wire seeks to compel TQ Delta to produce a Rule 30(b)(6) corporate designee regarding certain documents.

## ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case ..." FED. R. CIV. P. 26(b)(1). Proportionality is the standard, as mandated by the recent revisions to Federal Rule 26(b)(1), which require consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

---

[1] Neither defendant submitted additional argument in support of the Motion.
[2] The transcript from Oral Argument shall be referred to herein as "Tr." or the "Transcript." In scheduling Oral Argument, the Special Master advised the parties, in writing, to provide all materials upon which it would rely in advance of the hearing.

November 7, 2018
Page 3

information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The United States District Court for the District of Delaware has written on the topic of proportionality in recent years, and the Court has explained that it must "evaluate the parties' arguments for or against the requested production on the bases of the production sought, the other production to date, the degree of the requested production's relevance, and the burdens imposed on the party from whom the production is requested." *AVM Tech., LLC v. Intel Corp.*, 2016 WL 1948872, at *2 (D. Del. May 3, 2016). *See also Syngenta Corp. Protection, LLC v. Willowood, LLC*, 2016 WL 4925099, at *2 (D. Del. Sept. 14, 2016).

Federal Rule 37 permits a party to "move for an order compelling disclosure or discovery." FED. R. CIV. P. 37(a). "Generally, a party moving to compel discovery bears the burden of demonstrating the relevance of the requested information." *Novanta Corp. v. Iradion Laser, Inc.,* 2016 WL 4987110, at *2 (D. Del. Sept. 16, 2016) (citing *Del. Display Grp LLC v. Lenovo Grp Ltd.,* 2016 WL 720977, at *2 (D. Del. Feb. 23, 2016)). "It is [the moving party's] burden to show how discovery ... is proportional to the needs of the case." *Id.* at *4. Further, "[t]he parties and the court have a collective [responsibility] to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Id.* at *2.

## A.    The Sufficiency of TQ Delta's Document Production

2Wire moves to compel the production of all documents stored in the virtual data room established by Aware, Inc. *See* Motion at pp. 2-3. The data room was purportedly established by Aware, Inc.'s legal counsel, Global IP Law Group, in furtherance of Aware, Inc.'s efforts to sell its patents. *See* Motion at p. 3. During the course of this Action, 2Wire propounded general requests for documents, which arguably cover the documents contained in the data room. *See* Motion at pp. 2-3. TQ Delta produced documents responsive to these requests in an attempt to comply with the Special Master's rulings in a related case to maintain

November 7, 2018
Page 4

consistency.  *See* Opposition at p. 2.  On or about September 18, 2018, 2Wire requested the production of the data room in its entirety.  *See* Motion at p. 3.  2Wire acknowledges that TQ Delta produced some documents from the data room, *see* Transcript at p. 76, and the Special Master inquired as to the types of additional documents that 2Wire sought, *see id.* at p. 77.  2Wire was initially unwilling or unable to identify any additional documents beyond "a finite set of documents[,]" "all documents that related to the transaction between TQ Delta and Aware[,]" and "general category of documents that TQ Delta bought from Aware but that may  not be asserted."  Transcript at pp. 76, 77.

The Special Master is sensitive to the fact that this litigation is approximately four years old, and TQ Delta has made a request for a potentially, large pool of documents prior to the close of fact discovery. The Special Master also acknowledges the difficulty associated with responding to multiple parties' requests for information across several cases and the value that TQ Delta placed on consistency in satisfying its production obligations.  TQ Delta, however, filed these lawsuits, and the various defendants have different theories or arguments for defending their respective claims.  The various defendants have asserted different requests for documents with their different, if not competing theories in mind.   TQ Delta's existing production is purportedly based on the Special Master's ruling in *TQ Delta, LLC v. Zyxel Communications, Inc., et al.*, 13-2013-RGA (D. Del. Jan. 31, 2018) [D.I. #470], but in that instance, the dispute concerned the production of documents related to the agreement between TQ Delta and Aware, Inc. to purchase Aware, Inc.'s patent portfolio.  The context was different, not to mention the different parties, arguments, and counsel involved.  The Special Master has sought to limit the impact by inquiring what materials 2Wire seeks, in which 2Wire referenced "statements by Aware to TQ Delta about which patents are standard essential ..."  Transcript at p. 81.  The Special Master finds that such limitation is reasonable under the circumstances, and TQ Delta is compelled to produce any written statements made by Aware, Inc. to TQ Delta concerning Aware, Inc.'s position on what

November 7, 2018
Page 5

patents are standard essential, if any.[3]  The parties will meet and confer concerning the timing for the production.

## B.     The Redaction of Invoices on the Basis of Privilege

TQ Delta has redacted invoices concerning the work performed by Tzannes Patent Management ("TPM").[4]  *See* Motion at p. 3.  Since 2013, TPM has provided TQ Delta with "consulting services ... relating to its participation at the ITU, patent prosecution, patent licensing, and patent litigation efforts."   Opposition at p. 2.   TQ Delta argues that the redactions are necessary to protect against the disclosure of privileged communications.  *See id.* at p. 3.   Further, TQ Delta argues that the information contained in the invoices is irrelevant, particularly in light of TQ Delta's prior production of the TPM consulting agreement and their 1099 Tax Forms.  *See id.*  2Wire disputes these assertions, in which it contends that Messrs. Tzannes are not attorneys and their work is technical in nature.  *See* Motion at pp. 3-4.  Accordingly, 2Wire submits that the invoices cannot be privileged.

The Special Master finds that the redacted time entries on the TPM invoices may be privileged.  First, the attorney-client privilege extends to communications between the client, the attorney, "*and any of their agents* that help facilitate attorney-client communications or the legal representations."  *INVISTA N.A. S.a.r.l. v. M&G USA Corp.*, 2013 WL 12171721, at *4 (D. Del. June 25, 2013) (emphasis added).  Second, billing invoices can be privileged.  *See generally Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 2010 WL 9546391 (D. Del. June 17, 2010) (citing *Montgomery Co. v. Microvote Corp.*, 175 F.3d

---

[3] The Special Master finds that such limitation is appropriate, in which 2Wire waited until this late hour to seek judicial intervention.  While 2Wire states that "the issue came up during the deposition[,]" thereby justifying the delay, the Special Master does not find this explanation persuasive.  Transcript at p. 78.  These cases need to move forward and re-opening discovery to obtain materials that a party should have received (or requested), but did not, does not advance the ball.

[4] TPM is a company purportedly formed by Michael and Marcos Tzannes.  Marcos and Michael Tzannes invented a number of the relevant patents and were former executives of Aware, Inc.  *See* Opposition at p. 2.

November 7, 2018
Page 6

296, 304 (3d Cir. 1999)).  Third, while the conveying of technical information *alone* may not be privileged, communications of a technical nature may be privileged if such information is tied to the rendition of legal services.  *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805-06 (Fed. Cir. 2000).

TQ Delta has provided an unredacted copy of a TPM invoice for *in camera* review, which consists of a cover page and pages of descriptive time entries (the "Sample Invoice").[5]  The cover sheet sets forth several broad categories of work undertaken by TPM,[6] the number of hours worked, the hourly rate, and the total amount of fees.  The categories, number of hours, hourly rate, and total amount of fees on the cover page do not disclose privileged communications or facilitate the rendition of legal services.  *See generally Sokol Holdings Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501452, at *8 (Del. Ch. Aug. 5, 2009) ("[I]t is an overstatement of law to say that merely because attorney timesheets and invoices may at times implicate the privilege that timesheets and invoices can be blithely withheld in their entirety ...").  Thus, the information on the cover page does not include privileged information and should not be redacted.[7]  The descriptive time entries on the pages that follow the cover page may be privileged, and therefore, redacted to the extent that such entries include privileged communications or convey information for the purpose of rendering legal advice.

Further, the Special Master questions whether the information on the TPM invoices is relevant.  2Wire may inquire as to activities undertaken by TPM at a deposition.  2Wire will presumably acquire far greater information concerning TPM's activities through a deposition than an

---

[5]   A redacted copy of the Sample Invoice can be found at TQD137942-TQC147948.

[6]   The categories include:  Patent prosecution, Standards Participation, DSL Licensing/Litigation, DSL IPR, DSL Testing, MoCa Licensing/Litigation, and MoCa IPR.

[7] The general categories also appear as headings on the pages that follow the cover page.  The headings convey the same information as the general categories on the cover page, and these headings should not be redacted.

November 7, 2018
Page 7

invoice. To the extent that the information set forth in the TPM invoices demonstrates witness bias, *see* Reply at p. 2, TQ Delta's prior production of the consulting agreement and the 1099 tax forms not only provide ample information for establishing witness bias, but also render the TPM invoices largely irrelevant.

Accordingly, subject to the above finding concerning the cover page, the Special Master denies the request for relief.

## C.  The Assertion of Legal Privilege

The attorney-client privilege encourages full and open communication between a client and its attorney. *See Idenix Pharmaceuticals, Inc. v. Gilead Sciences, Inc.*, 195 F. Supp. 3d 639, 642 (D. Del. 2016). "The burden of demonstrating the applicability of the attorney-client privilege rests on the party asserting the privilege." *Id.* The party asserting privilege must show:

> (1) [T]he asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client; (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an option on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* (quoting *In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979)). The attorney-client privilege protects "communications made for the purpose of obtaining or giving legal advice." *Id.* at 645 (quoting *3V, Inc. v. CIBA Specialty Chemicals Corp.*, 587 F. Supp. 2d 641, 647 (D. Del. 2008)). Conversely, "[i]f the primary purpose of a communication is to solicit or render advice on non-legal matters, the

November 7, 2018
Page 8

communication is not within the scope of the attorney-client privilege." *Id.* at 644 (quoting *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 147 (D. Del. 1977)). For instance, when the communication relates to a business concern, the attorney-client privilege will not shield the communication from disclosure. *See Immersion Corp. v. HTC Corp.*, 2014 WL 3948021, at *1 (D. Del. Aug. 7, 2014). Given the potential blurred line between business and legal concerns, the court will look to the primary purpose of the communication to determine whether it is privileged. *See id.*

The attorney-client privilege is not absolute. Notably, the privilege does not protect against the disclosure of underlying facts. *See In re TQ Delta and Jason H. Vick*, 2018 WL 5033756, at *3 (D. Del. Oct. 17, 2018) (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 396 (1986)). The United States Supreme Court held that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co.*, 449 U.S. at 395. The Court added:

> [T]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id.* at 395-96 (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962) (emphasis omitted)). *See also McSparran v. Com. of Pa.*, 2016 WL 687992, at *2 (W.D. Pa. Feb. 18, 2016). Moreover, "[b]ecause the privilege militates against the general rule promoting full disclosure of information between parties to a lawsuit, ... courts must construe it narrowly." *INVISTA N.A. S.a.r.l.*, 2013 WL 12171721, at *3.

November 7, 2018
Page 9


   *1. Michael Tzannes*

a. *Knowledge of Potential Bidders*

2Wire objects to the instruction of TQ Delta's counsel to refrain from testifying as to the witness's knowledge of potential bidders on the basis of the attorney-client privilege. *See* Motion at p. 4. TQ Delta states that the witness answered the question, and thus, the issue is moot. *See* Opposition at p. 5. The relevant portions of the deposition testimony are as follows:



November 7, 2018
Page 10



November 7, 2018
Page 11

Opposition at Exh. 2, 175:12-178:18, 180:18-181:7.   Mr. Tzannes
indicated that he did not know the identity of another bidder on at least
three (3) separate occasions.   While he referenced, in general terms, a
communication with legal counsel for Aware, Inc. concerning the bid
process, the witness thereafter testified that he did not know the names
of another bidder at least twice.   Of note, the witness indicated that he
knew of potential bidders, but the questioning attorney did not appear to
recognize the distinction or elected not to pursue that line of questioning.
2Wire argues that legal counsel's instruction limited Mr. Tzannes'
testimony, or in the alternative, impeded it from asking additional
questions.   *See* Transcript at pp. 20-21.   The deposition transcript,
however, shows that Mr. Tzannes does not remember the names of the
other bidders, and the Special Master cannot compel a fact witness to
remember.   Thus, this issue is moot, and the Special Master denies the
request for relief.

b.    *Scope of Consulting Work*

2Wire objects to the instruction of TQ Delta's counsel to refrain from
testifying as to the scope of the witness's activities on the basis of the
attorney-client privilege.   *See* Motion at p. 4.   2Wire argues that the
questioning sought to elicit testimony concerning facts, as opposed to
privileged communications.   *See id.*   TQ Delta disagrees.   *See*
Opposition at p. 5.   The relevant portions of the deposition testimony are
as follows:



November 7, 2018
Page 12



November 7, 2018
Page 13

Motion at Exh. C, 217:18-220:25. Mr. Tzannes refused to answer a question as to whether or not he performed a specific act on the basis of the attorney-client privilege. The question sought to elicit a yes or no response regarding acts that Mr. Tzannes may have undertaken. The question did not probe into communications between legal counsel and Mr. Tzannes.[8] The question did not inquire as to the reason for why Mr. Tzannes undertook the act (if he, in fact, performed the act). TQ Delta argues that the questioning sought to "reveal[] the nature of the privilege and work product done at the request of counsel[,]" Tr. at p. 18, but the questioning never progressed to that point due to the witness's refusal to answer questions that were intended to establish a foundation for additional inquiry.[9] *See* Motion at Exh. C. Further, whether or not Mr. Tzannes compared the claims is a fact within his personal knowledge that is not privileged. *See Upjohn Co.*, 449 U.S. at 895-96.

Based on the record before the Court, the Special Master finds that 2Wire has satisfied its burden and compels Mr. Tzannes to answer questions concerning analyses that he may have undertaken. The Special Master grants the requested relief without prejudice to TQ Delta's ability to assert privilege to the extent that future questioning elicits testimony concerning privileged communications.

   2.   *Rule 30(b)(6) Designee—Mark Roche*

TQ Delta designated Mr. Roche to testify on its behalf as to certain unidentified topics. Generally speaking, 2Wire objects to the instruction of TQ Delta's counsel to refrain from testifying as to the following

---

[8] TQ Delta's counsel, in fact, appears to interject the fact that Mr. Tzannes performed the analysis, and he did so at the request of legal counsel. *See* Transcript at pp. 17-18. The deposition testimony never progressed to the point where Mr. Tzannes was asked to disclose the participation of legal counsel, if any. *See* Motion at Exh. C.

[9] Additionally, assuming Mr. Tzannes undertook an analysis, we do not know when the analysis took place or if he performed the analysis independent of any instruction from legal counsel.

November 7, 2018
Page 14

topics on the basis of the attorney-client privilege.  *See* Motion at pp. 4-5.

a.      *Analysis of the DSL Patents Offered for Sale*

2Wire inquired as to TQ Delta's efforts to analyze the patents offered by Aware, Inc. for sale.  *See* Motion at p. 5.  TQ Delta did not object to the line of questioning cited in the Motion.  *See* Motion at Exh. D, p. 166:3-23.   Mr. Roche, however, limited his response on the basis of the attorney-client privilege.  *Id.*  2Wire referenced the following testimony in the Motion to support its argument:



*Id.*   The deposition transcript indicates that Mr. Roche answered the question concerning evaluation of the patents in the affirmative.  *See* Motion at Exh. D, p. 166:16-19.  TQ Delta, in fact, evaluated the patents. *See id.*   2Wire has not stated that it is looking for any additional information or attached additional pages from Mr. Roche's deposition to

November 7, 2018
Page 15

the Motion.  *See* Motion at p. 5; Motion at Exh. D, p. 166; Transcript at p. 22.

For the sake of efficiency, the Special Master will presume that 2Wire takes the position that the assertion of legal privilege prevented it from inquiring as to the level or manner of evaluation undertaken.  At the outset, the Special Master notes that 2Wire did not clarify, describe, or explain what type of information it sought by inquiring about 'evaluation,' which impairs the Special Master's ability to grant relief in this instance.  Nevertheless, TQ Delta relies on two decisions from the District of Delaware in preventing 2Wire from inquiring further: *Intellectual Ventures I, LLC v. Altera Corp.*, 2013 WL 123220005 (D. Del. July 25, 2013) and *Intellectual Ventures I, LLC v. AT&T Mobility, LLC*, 2016 WL 3213585 (D. Del. June 2, 2016).  2Wire did not address either case in the Reply or at oral argument.

In *Altera*, the plaintiff sought a protective order to prevent its adversary from re-opening the depositions of several fact witnesses and seeking the discovery of documents withheld on the basis of privilege.  *See* 2013 WL 12322005.  Then Judge Stark granted the protective order as to the depositions in its entirety and to the documents in part.  *See id.* at *6.  With respect to the re-opening of depositions, Judge Stark discussed two fact witnesses.  *See id.* at *2-4.  One fact witness was a consultant and the other fact witness was an attorney.  *See id.*  The Special Master focuses on Judge Stark's analysis of the consultant's testimony and the assertion of privilege, in which Edenbolm was hired to locate patents for acquisition and negotiate the terms of the sale.  *See id.* at *2-3.  Plaintiff objected to a line of questioning concerning Edenbolm's understanding of plaintiff's process for identifying patents that it may want to acquire on the basis of the attorney-client privilege.  *See id.* at *3.  The court found that the objection was proper—"patent valuation, while in this instance tied to business decisions of patent acquisition, may be intertwined with legal analysis, including considerations of claim scope, validity, and licensing power."  *Id.*  Judge Stark, however, suggested that the impact of the plaintiff's assertion of privilege was limited, because the fact witness testified concerning "his understanding of what makes a

November 7, 2018
Page 16

patent 'high value' ..., and also his understanding of the process of identifying 'good patents.'" *Id.* at *3.

In *AT&T Mobility*, the defendant sought to compel the plaintiff to produce certain documents withheld from production on the basis of the attorney-client privilege. *See* 2016 WL 3213585. Chief Judge Stark reviewed the documents *in camera*, and he concluded that the majority of the documents were privileged. *See id.* at *1-2. In general terms, the privileged documents contained advice from or analysis by legal counsel. *See id.* The court found that the other documents were not privileged, because the information was publicly-available or factual in nature. *See id.* Unfortunately, *AT&T Mobility* does not offer significant legal analysis to guide the Special Master in this case.

The record before the Special Master is limited. The excerpts from the transcript show that the corporate designee testified that TQ Delta evaluated the patents. While the corporate designee refrained from providing additional details concerning TQ Delta's evaluation based on the involvement of legal counsel, 2Wire did not help its case by failing to inquire as to non-privileged aspects of the evaluation process, failing to attach relevant excerpts from the deposition, or explaining what it meant by 'evaluation.' The Special Master's decision is based on the record before the Court, which indicates that the corporate designee answered the question posed, and thus, the issue is moot.

b.     *Efforts to Verify Representations of Aware, Inc.*

2Wire inquired as to whether TQ Delta attempted to verify certain representations made by Aware, Inc. concerning its patent portfolio. The relevant portions of the deposition testimony are as follows:



November 7, 2018
Page 17



Motion at Exh. D, pp. 174:22 – 176:2.  The witness previously
testified that legal counsel played a large role in TQ Delta's decision
to acquire patents from Aware, Inc.  *See* Motion at Exh. D, p. 166.
With respect to this specific issue, the witness testified that legal
counsel played a role in evaluating the accuracy of the
representations of Aware, Inc.  In response to further inquiry, the
witness testified that he did not possess any non-privileged
information concerning TQ Delta's efforts to confirm the
truthfulness of Aware, Inc.'s representations.  While 2Wire
acknowledges this exchange, *see* Tr. at pp. 38, 42, it ignores the

November 7, 2018
Page 18

witness's answer, in which the corporate designee states that TQ Delta does not possess any non-privileged information. *See* Motion at Exh. D, p. 175. Accordingly, the issue is moot, and the Special Master denies the request for relief.

c.    *The Testing of Patents*

2Wire asked questions concerning TQ Delta's efforts to 'test' the patents.   The relevant portions of the deposition testimony are as follows:



November 7, 2018
Page 19



Motion at Exh. D, pp. 204:23 – 206:16.  At oral argument, TQ Delta did not press the argument that the line of questioning was outside the bounds of the deposition notice.  Further, TQ Delta was not able to identify the other witness or point to testimony from another designee concerning this very topic.  *See* Transcript at pp. 47-48.

The issue turns on whether the requested information is privileged. Based on the record, the Special Master does not find that the requested information is protected from disclosure under the work product doctrine.   TQ Delta essentially argues that it is in the business of licensing patents, and thus, litigation is inevitable.  "The mere possibility of litigation is insufficient to meet the 'in anticipation of litigation' requirement."  *Paris v. R.P. Scherer Corp.*, 2006 WL 1982876, at *2 (D. N.J. July 13, 2006).  "Litigation is reasonably predictable or foreseeable when there is 'an identifiable specific claim of impending litigation' at the time the documents are prepared."  *Id.*  The fact that litigation eventually develops will not resurrect a claim of work product if the

November 7, 2018
Page 20

documents were created at a time when litigation was not anticipated, *see id.*, and in this instance, the record does not support the assertion that litigation against any party was imminent, foreseeable, reasonably predictable, or anticipated at the time of the testing.  Further, the record does not support a finding that testing was undertaken solely for the purpose of litigation.  *See id.* at *3.  Finally, the witness's self-serving, conclusory testimony concerning litigation does not prove sufficient. Accordingly, the Special Master does not find that the requested information is protected from disclosure under the work product doctrine.[10]

Unlike the work product doctrine, the attorney-client privilege does not include an 'in anticipation of litigation' requirement.  In this instance, the witness testified that TQ Delta tested the relevant products.  While this testimony may cause the testing to constitute legal services for purposes of establishing the privilege, the record is unclear on several critical points, namely (1) what is meant by testing, (2) when was the testing undertaken, (3) who performed the testing, (4) what products were tested, and (5) why was the testing undertaken.  The Special Master finds that the line of questioning was prematurely disrupted by argument between legal counsel for 2Wire and TQ Delta.   Thus, the Special Master will compel Mr. Roche (or another corporate designee) to answer questions concerning testing undertaken by TQ Delta subject to TQ Delta's right to invoke legal privilege.

d.      *TQ Delta's Licensing Rate*

Mr. Roche testified that the process for determining a royalty rate was privileged and he was unable to speak to specifics without disclosing communications protected from disclosure under the attorney-client

---

[10] The Special Master notes that neither party stated when the testing occurred. Thus, the Special Master's finding that the information is not protected by the work product doctrine is without prejudice to TQ Delta's assertion of the privilege based on the development of additional facts which were not developed through the testimony.

November 7, 2018
Page 21

privilege.  *See* Motion at p. 5.  The relevant portions of the deposition testimony are as follows:[11]



Opposition at Exh. 3, p. 37:15-25.  TQ Delta takes the position that the determination of a royalty rate is inextricably intertwined with legal advice such that there is no non-privileged information responsive to the request.   TQ Delta relies on the *Altera* and *AT&T Mobility* cases to support its position.   The Special Master previously ruled that *AT&T Mobility* is of limited value to the present analysis.   *Altera*, however, acknowledges the close relationship between business and law in valuing a patent, in which then Judge Stark ruled that that the requested information was privileged.   *See Intellectual Ventures I, LLC*, 2013 WL 123220005 at *3.   Notably, the *Altera* court referenced the witness's testimony in related areas as part of its decision to uphold legal privilege. *See id.*  Judge Andrews expressed a different point of view in *Immersion Corp.*, in which the court ordered the production of certain documents that it found "to be primarily for business purposes as it provide[d] factual information about licensing/royalty rates, the primary purpose of the [p]laintiff's business." 2014 WL 3948021, at *2.

---

[11]  2Wire references page 38 of the Roche deposition transcript in the Motion, but they failed to attach that page or any excerpt from the deposition concerning royalty rates.  *Compare* Motion at p. 5; Motion at Exh. D.  It was 2Wire's responsibility to provide all necessary materials in advance of oral argument, and thus, the Special Master will cite to limited excerpts from the deposition testimony attached to the Opposition.

November 7, 2018
Page 22

The Special Master acknowledges the unique nature of patents, which present a close relationship between business and the law. *See generally Abbvie Inc. v. Boehringer Ingelheim International GMBH*, 2018 WL 2995677, at *2 (D. Del. June 14, 2018); *Hercules, Inc.*, 434 F. Supp. at 147. While the interests may be complimentary, the Special Master does not find that a determination of a royalty rate is inextricably intertwined such that there are no pure business considerations subject to discovery.[12]  This is particularly true where TQ Delta's principal purpose is to monetize its patent portfolio.  If TQ Delta did not consider any economic factors or market conditions in determining its royalty rate, then it may make this position known on the record.  If TQ Delta considered economic factors and/or market conditions, but such consideration was undertaken by its attorneys, the Special Master questions whether such analysis constitutes the rendition of legal services protected under the attorney-client privilege.  The Special Master is inclined to find that such analysis of economic and/or market factors is business in nature, and thus, not privileged. *See Immersion Corp.*, 2014 WL 3948021, at *2-3; *Indenix Pharmaceuticals, Inc.*, 195 F. Supp. 3d at 644-45 (finding that an e-mail to in-house counsel concerning marketing and business development was not privileged).  After all, TQ Delta had to determine a royalty rate.  In the absence thereof, TQ Delta could not have monetized its patent portfolio or otherwise generated any revenue.  In short, the royalty rate was critical to the operation of its business model, and in its absence, TQ Delta would be unable to function.  Thus, the "primary purpose" for the consideration of economic and/or market factors was not legal in nature. *See id.  See generally INVISTA N.A. S.a.r.l.*, 2013 WL 12177121, at *4 ("In line with the narrow construction that it receives, '[t]he privilege protects *only* those disclosures – necessary to obtain informed legal advice – which might not have been made absent the privilege.'") (quoting *Westinghouse*, 951 F.2d at 1423-24) (emphasis in original)).

---

[12]  The *Georgia Pacific* factors include a number of economic considerations that require no application of facts to the law. *See Georgia Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

November 7, 2018
Page 23

Further, it appears to the Special Master that TQ Delta is attempting to use the attorney-client privilege as a sword and a shield in this instance to protect a company whose business is the licensing of patents. *See generally Immersion Corp.*, 2014 WL 3948021, at *2. TQ Delta has established a royalty rate, and its litigation position requires not only its adversaries, but also the Court to accept this figure *ipso facto*. This position is unacceptable. TQ Delta's efforts to limit 2Wire's inquiry on this topic to its expert witness further support the Special Master's conclusion that TQ Delta is attempting to 'have it both ways.'[13] Accepting as true TQ Delta's position that a royalty calculation is a highly complicated or specialized analysis, thereby necessitating an expert opinion, *see* F.R.E. 702, a fact witness (or corporate designee) can testify regarding basic facts without overstepping the bounds of lay testimony. Based on the available record, the line of questioning was general in nature and did not appear to approach the lay / expert witness line.[14]

The Special Master compels Mr. Roche (or another corporate designee) to testify regarding any non-privileged information concerning the determination of a royalty rate. The Special Master acknowledges that there may be a blurry line between business and the law in this field, in which case, Mr. Roche (or another corporate) need not disclose legal analysis, for example, claim analysis, validity, or the strength of the patent.[15]  2Wire, however, is entitled to inquire into fundamental economic or market factors that may have played a role in TQ Delta's determination of its royalty rate.

---

[13] TQ Delta's expert presumably relied on non-privileged information in rendering an opinion, and 2Wire is entitled to question TQ Delta regarding fundamental facts that its expert likely considered.

[14] TQ Delta may pursue a motion *in limine* to the extent that a fact witness oversteps his or her bounds.

[15] This is not intended to be an exhaustive list.

November 7, 2018
Page 24

*e.      The Decision to File Suit*

Mr. Roche refused to identify the individual who made the decision to file this lawsuit on the basis of privilege.  The relevant portions of the deposition testimony are as follows:



Motion at Exh. D, pp. 32:7 – 33:6.  It  is a fact that TQ Delta filed a Complaint against 2Wire.  Someone authorized TQ Delta to file the Complaint.  While attorneys undoubtedly played a major role in drafting the Complaint, attorneys do not make the decision to file suit.  This decision rests exclusively within the authority of the client, and it is

November 7, 2018
Page 25

largely a business decision.  2Wire inquired whether Mr. Roche authorized the filing of the Complaint.  The question required a yes or no response.  The question did not seek the reason for filing the Complaint, nor did 2Wire inquire as to why TQ Delta asserted specific claims.  Further, 2Wire did not probe into any communications between TQ Delta and its attorneys.  The identity of the person who decided to file suit is not protected from disclosure under the attorney-client privilege or work product doctrine.  Accordingly, the Special Master compels Mr. Roche to answer the question.

### 3    Rule 30(b)(6) Designee—Abha Devine.

TQ Delta designated Ms. Devine to testify on its behalf as to certain unidentified topics.  Generally speaking, 2Wire objects to the instruction of TQ Delta's counsel to refrain from testifying as to the following topics on the basis of the attorney-client privilege.  *See* Motion at p. 5.

### a.    The Published Patent Licensing Rates

2Wire asked a series of questions concerning TQ Delta's calculation of its published licensing rates.   TQ Delta objected to the line of questioning on the basis of the attorney client privilege and instructed the witness to answer the question to the extent possible without disclosing privileged communications or attorney work product.  Unlike other sections, the relevant deposition testimony on this issue is considerably lengthy.  *See* Motion at Exh. E; Opposition at Exh. 5.  To summarize, 2Wire inquired as to the basis for the published patent licensing rates.  *See* Motion at Exh. E, pp. 67-70, 72, 74-75.  TQ Delta responded that it worked with legal counsel in determining the rates.  *See, e.g.,* Motion at Exh. E, p. 70.

TQ Delta's published patent licensing rates are relevant to the parties' claims and defenses, and it has been the topic of prior motion practice between the parties, in which the Special Master has relied on the existence of such rates to deny defendants' requests for additional discovery concerning draft settlement agreements and licensing negotiations.  *See, e.g., TQ Delta, LLC v. Zyxel Communications, Inc., et*

November 7, 2018
Page 26

*al.*, C.A. No. 13-2013-RGA (Jan. 31, 2018), White, S.M. [D.I.# 470].[16]
TQ Delta, however, claims that the information underlying the published
patent licensing rates is privileged in this context. *See* Opposition at p.
7; Transcript at pp. 58-63. TQ Delta also takes the position that this area
of inquiry is not appropriate for a lay person, *see* Transcript at p. 62
("It's not a matter for a 30(b)(6) designee, let alone a lay person."), but
rather, should be answered by its expert, *see* Transcript at p. 61 ("TQ
Delta has done it through an expert witness."). While the Special Master
appreciates that the calculation of a licensing rate is a "very
complicated" process, Transcript at p. 60, the line of questioning
concerned the basis for or information supporting the published licensing
rates. 2Wire is entitled to discover the non-privileged information that
TQ Delta considered in setting its published licensing rates, for example,
business or economic considerations. To the extent that TQ Delta did
not consider market or economic conditions in setting the published
licensing rates, this fact should be disclosed.

TQ Delta will undoubtedly argue that the consideration of economic
factors is privileged, because either an attorney considered the factors
him/herself or a non-attorney considered the factors at the instruction of
an attorney. Business considerations are not privileged. *See generally
Immersion Corp.*, 2014 WL 3948021, at *1. Judge Andrews addressed
this topic in *Immersion Corp.* in the context of a motion to compel the
production of documents, in which the Court ordered the disclosure of
certain e-mails and draft slides sent to outside legal counsel that
"provide[d] factual information about licensing/royalty rates." *Id.* at *2.
Judge Andrews' decision appeared to be influenced, in part, by the fact
that the primary purpose of the asserting party's business was the
collection of licensing and/or royalty fees. *See id.* The Motion,
however, concerns testimony and not the production of documents.

---

[16] *See* Transcript of Oral Argument at 77:3-8, *TQ Delta, Inc. v. Zyxel
Communications, Inc., et al.*, C.A. No. 13-2013-RGA (D. Del. Jan. 9, 2013), White,
S.M. ("Again, as Judge Andrews said, no probative value for negotiation documents,
zero. And secondly, they have our published rate card. If they want to know the
rates being offered are, they have that. They had that for a long time. That had that
for years. So I will leave you with that.").

November 7, 2018
Page 27

Thus, the Special Master is not able to review a specific document to understand whether the primary purpose of the document is legal or business. *See id.* at *1. Based on argument presented in the consolidated cases, the Special Master knows that TQ Delta's business is predicated upon the collection of licensing fees and enforcement of its patents. In order to collect such fees, TQ Delta must first set a rate to be charged. Thus, the licensing rate is the bedrock of TQ Delta's business, and economic or market considerations that played a role in the creation of TQ Delta's published licensing rate are not privileged.

Additionally, as set forth above, TQ Delta opposes the request for relief on three fronts: (1) the information is privileged; (2) this is inappropriate lay person testimony; and (3) an expert witness is available and capable of testifying to this information. The Special Master finds that TQ Delta, like any litigant, is attempting to control the amount of information and source of such information by insisting that such testimony should be elicited from an expert witness. The Special Master further finds that the assertion of legal privilege in this context acts as both a sword and a shield, in which TQ Delta wields the privilege when it wants to prohibit testimony (no testimony from lay witness or corporate designee), but drops its guard to introduce favorable testimony (i.e., the testimony should come from an expert witness). The courts prohibit parties from asserting privilege in this matter,[17] and 2Wire should be permitted to inquire as to non-privileged information that TQ Delta considered in establishing its licensing rate, for example, economic or business considerations.

To be clear, the Special Master does not find that TQ Delta waived the legal privilege. The foundation for that battle has not been properly laid.

---

[17] *See CP Kelco U.S., Inc. v. Pharmacia Corp.*, 213 F.R.D. 176, 179 (D. Del. 2003) ("It would be manifestly unfair to allow a party to use the privilege to shield information which it had deliberately chosen to use offensively ... Hence the truism that privilege cannot be used as both a shield and a sword."). *See also Johns Hopkins Univ. v. Alcon Laboratories, Inc.*, 2017 WL 3013249, at *3 (D. Del. July 14, 2017); *In re Intel Corp. Microprocessor Antitrust Litigation*, 258 F.R.D. 280, 291 (D. Del. 2008); *Synalloy Corp. v. Gray*, 142 F.R.D. 266, 269 (D. Del. 1992).

November 7, 2018
Page 28

For example, the questioning of the witness on the issue of TQ Delta's published licensing rates has been in general terms and the corporate designee's answers were limited as a result of the argument by legal counsel.  The Special Master does not currently stand in a position to determine waiver, and more importantly, 2Wire does not argue waiver in the Motion.  *See* Motion.

Based thereon, the Special Master compels Ms. Devine (or another corporate designee) to provide testimony concerning the non-privileged factual basis for TQ Delta's published licensing rates.[18]

*b.   FRAND Rates*

2Wire objects to the instruction of TQ Delta's counsel to refrain from testifying as to whether TQ Delta considered its licensing rates to be FRAND rates on the basis of the attorney-client privilege.  *See* Motion at p. 5.  TQ Delta argues that the objection is moot in light of the witness's deposition testimony.  *See* Opposition at p. 7.  The relevant portions of the deposition testimony are summarized as follows:



---

[18] To the extent that the Opposition constitutes a Cross-Motion for a Protective Order, the Special Master denies the application without prejudice.  The Special Master has not found that TQ Delta waived the legal privilege.  Furthermore, to the extent that the corporate designee testifies as to matters that are of a scientific, technical, or specialized matter, such testimony would likely be inadmissible at trial and the subject of a motion *in limine*.  *See* F.R.E. 701-702.

November 7, 2018
Page 29

Opposition at Exh. 5, p. 69:10-25.   2Wire complains that TQ Delta should be compelled to answer "whether [it] believes those rates to be compliant with its FRAND obligations", yet the deposition transcript reveals that the corporate designee answered the question.   *Compare* Motion at p. 5; Opposition at Exh. 5, p. 69:10-25; Transcript at pp. 58-59.   Thus, the issue is moot, and the Special Master denies the request for relief.

     *4.    Marcus Tzannes*

2Wire objects to the instruction of TQ Delta's counsel to refrain from testifying as to whether Mr. Tzannes knew the number of DSL standard-essential patents on the basis of privilege.   *See* Motion at p. 6.   TQ Delta asserts that the requested information is protected from disclosure under the attorney-client privilege and work product doctrine.   *See* Opposition at p. 7.   The relevant portions of the deposition testimony are summarized as follows:



November 7, 2018
Page 30



Motion at Exh. G, 434:18-436:22.  The question at-issue concerned
Mr. Tzannes's knowledge of the number of DSL standard-essential
patents.  *See id.*  The testimony indicates that he knows of a number
of DSL standard-essential patents, but the source of his knowledge is
uncertain.  If he possesses personal knowledge of the matter, then
the question does not touch on any privileged communications.
Alternatively, if his knowledge is dependent on information obtained
from TQ Delta's attorneys, then the subject matter may be
privileged.  One particular Q & A suggests that the source of his
knowledge may be an attorney, but the record is unclear.  *See*
Motion at Exh. G, 436:4-8.  Additionally, although neither party
referenced this portion of the transcript in their written submissions
or at oral argument, Mr. Tzannes testified the he did not know how
many standard-essential patents there are in the wifi area.  *See*
Motion at Exh. G, 436:19-22.  The Special Master does not know if
there is a significant difference between 'DSL' and 'wifi.'  While
the Special Master suspects that there is a difference, he does not
possess the particularized knowledge – or evidence in the record – to

November 7, 2018
Page 31

make this distinction.  Based on the record before the Court, which is unclear and/or incomplete due to the questions posed,[19] the Special Master does not find that 2Wire satisfied its burden as the movant and denies the request for relief.

### 5.   Bruce Bernstein

Mr. Bernstein "is an attorney retained by TQ Delta to assist with its attempts to license its DSL patent portfolio, including the patents in suit."  Opposition at p. 8.  He is listed on TQ Delta's Initial Disclosures as an individual who possesses relevant information.  *See* Motion at p. 6. 2Wire deposed Mr. Bernstein on October 1, 2018.  *See* Motion at Exh. H.   During the deposition, 2Wire inquired as to the terms of Mr. Bernstein's retention.   *See* Motion at Exh. H, pp. 46-47.   He was instructed not to answer those questions to the extent that the questions concerned attorney-client communications.   *See id.*   2Wire also questioned Mr. Bernstein as to how TQ Delta determined a patent to be standard-essential.   *See* Motion at Exh. H, p. 132.   Again, he was instructed not to answer those questions on the basis of the attorney-client privilege.

First, 2Wire seeks to compel Mr. Bernstein to testify regarding the terms of his retention.   2Wire asserts that such information is relevant to witness bias.  *See* Motion at p. 6.  TQ Delta opposes the request.  *See* Opposition at p. 8.  TQ Delta argues that such information is irrelevant. *See id.*   The Special Master disagrees.   Mr. Bernstein is listed as a potential trial witness, and thus, his credibility is subject to scrutiny. Whether Mr. Bernstein will personally profit from a favorable outcome at trial is relevant to his credibility, and in this Circuit, it is well accepted law that "[t]he attorney-client privilege does not shield fee arrangements."  *Montgomery Co. v. Microvate Corp.*, 175 F.2d 296, 304 (3d Cir. 1999) (citing *In re Grand Jury Investigation*, 631 F.2d 17, 19

---

[19] Unlike other deposition testimony relevant to the Motion, *see, e.g.,* Section. C(2)(d) *infra*, the Special Master does not find that argument by or between counsel is the cause for the incomplete record.  Thus, the Special Master denied the request for relief.

November 7, 2018
Page 32

(3d Cir. 1980)).  *See also Indenix Pharmaceuticals, Inc.*, 195 F. Supp. 3d at 644; *Breslin v. Dickinson Township*, 2011 WL 2926665 (M.D. Pa. 2011); *AU New Haven, LLC v. YKK Corp.*, 2016 WL 6820383, at * 5 (S.D.N.Y. Nov. 18, 2016); *Davis v. Ross*, 107 F.R.D. 326, 327 (S.D.N.Y. 1985).  Accordingly, the Special Master grants the request for relief and orders Mr. Bernstein to answer questions concerning the terms of his retention agreement.  *See generally id.* ("The Plaintiff is entitled to probe for bias by inquiring into the existence and nature of the relationship between [the attorney] and [the client where the attorney may be called as a witness at trial].  Specifically, plaintiff may discover what, if any, fee arrangements and retainer agreements were entered into between the two.").  To the extent that TQ Delta finds such information prejudicial, it can move to seal the deposition transcript (if the transcript is not already covered in the parties' confidentiality order) and/or file a motion *in limine* to exclude the testimony at trial.[20]

Second, 2Wire seeks to compel Mr. Bernstein to provide testimony as to whether the relevant patents are standard-essential patents.  The Special Master finds that such information is legal in nature,[21] and Mr. Bernstein's potential involvement would fall within the scope of the rendition of legal services protected from disclosure under the attorney-client privilege.  Thus, the Special Master denies the request for relief.

## D.    TQ Delta's Intent to Seek a Protective Order

2Wire complains that TQ Delta's comments regarding its intent to seek a protective order are unfair.  The Special Master is not aware of – and 2Wire has not identified – a form of relief capable of remedying this issue.  Federal Rules 26 and 37 concern the entry of a protective order. Either party is free to petition the Court for relief under the Federal Rules, and the Special Master has provided the parties with a framework by which the parties can contact the Special Master for immediate relief.

---

[20] Furthermore, in the event that TQ Delta does not call Mr. Bernstein as a witness at trial, the issue is moot.

[21] 2Wire has not submitted any legal authority to support its assertion that this matter is a "business determination."  Motion at p. 6.

November 7, 2018
Page 33

Neither party exercised this option in this context.[22]   Further, the indication of an intent to seek a protective order is not a formal application for relief.  It is merely bluster.  Where this issue does not present a justiciable controversy, the Special Master finds that the issue is not ripe for a decision and denies the 'request' for relief.

### E.   The Production of an Additional 30(b)(6) Corporate Designee

2Wire sought to compel TQ Delta to produce an additional corporate designee regarding a document – "Attachment B" – that was produced during the deposition of Rule 30(b)(6) corporate designee, Mark Roche. *See* Motion at p. 7.  Following oral argument, the parties reached an agreement to address this issue.  *See* Paul McAndrew's E-Mail to Special Master David White, dated November 2, 2018.  Thus, the issue appears to be moot.

### F.   The Availability of the Special Master to Resolve Discovery Disputes.

The Special Master is committed to resolving any and all discovery disputes between the parties.   In September 2018, the parties demonstrated foresight in contacting the Special Master regarding a protocol for resolving disputes that arise at depositions.  The Special Master provided a framework by which potential issues should be addressed and expressed his willingness to assist the parties.   The parties, in fact, utilized the framework, which resulted in the Special Master making two rulings that same day.  To the extent that the parties believe the proposed framework is in need of revision, the Special Master invites the parties' input.  However, the framework was offered for the purpose of providing expedient relief and to avoid the situation in which the parties currently find themselves—a small window of time for

---

[22] The Special Master has indicated an intent to make himself available to resolve any discovery issues, and the Special Master encourages the parties to make use of the procedures for not only obtaining expedient relief, but limiting gamesmanship.

November 7, 2018
Page 34

completing discovery and the need to schedule travel for attorneys, witnesses, and court reporters to complete depositions.

**IT IS SO ORDERED,**

David A. White (DE #2644)