# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 13-cv-1835-RGA |
| | ) | |
| v. | ) | |
| | ) | PUBLIC VERSION |
| 2WIRE, INC., | ) | FILED FEBRUARY 21, 2020 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT 2WIRE, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL FOR FAMILY 2

OF COUNSEL:
Brett Schuman (*pro hac vice*)
Rachel M. Walsh (*pro hac vice*)
GOODWIN PROCTER LLP
Three Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone:  415.733.6000

Douglas J. Kline (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Masachusetts 02210
Telephone:  617.570.1000

Andrew S. Ong (*pro hac vice*)
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
Telephone:  650.752.3100

Cindy Chang (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, New York 10018
Telephone:  212.813.8800

Dated:  February 14, 2020

Jody C. Barillare (#5107)
MORGAN LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, Delaware 19801
Telephone:  302.574.3000
jody.barillare@morganlewis.com

*Attorneys for Defendant 2Wire, Inc.*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. LEGAL STANDARD...........................................................................................3

III. NATURE AND STAGE OF THE PROCEEDING................................................4

IV. ARGUMENT .......................................................................................................4

  A. The Court Should Enter JMOL That 2Wire Does Not Infringe the Asserted Claims. ....................................................................................4

  B. The Court Should Enter JMOL That The Asserted Claims Are Invalid As Anticipated By Counterman. .........................................................11

  C. In The Alternative, The Court Should Grant 2Wire A New Trial. .......................14

    1. The Court's Jury Instruction on Infringement was in Error and Warrants a New Trial.................................................................15

    2. The Court's Ruling on the Consideration of Counterman During Prosecution Was Prejudicial Error Warranting a New Trial. ...................17

    3. The Court Should Grant a New Trial on Infringement and Invalidity Because the Jury's Verdict Is Against the Clear Weight of the Evidence. .......................................................................18

V. CONCLUSION....................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
　501 F.3d 1307 (Fed. Cir. 2007)......................................................................................5, 7

*AVM Techs., LLC v. Intel Corp.*,
　334 F. Supp. 3d 623 (D. Del. 2018)................................................................................3, 19

*Carrier Corp. v. Goodman Glob., Inc.*,
　162 F. Supp. 3d 345 (D. Del. 2016)................................................................................3

*DDR Holdings, LLC v. Hotels.com, L.P.*,
　773 F.3d 1245 (Fed. Cir. 2014)......................................................................................11

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
　No. CIV.A. 05-737-JJF, 2010 WL 3056617 (D. Del. July 30, 2010)..............................3, 15

*Dystar Textilfarben GmbH & Co. Deutschland KG v. CH Patrick & Co.*,
　464 F.3d 1356 (Fed. Cir. 2006)......................................................................................11

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
　798 F. Supp. 2d 541 (D. Del. 2011)................................................................................19

*Orion IP, LLC v. Hyundai Motor Amer.*,
　605 F.3d 967 (Fed. Cir. 2010)........................................................................................11

*Pannu v. Iolab Corp.*,
　155 F.3d 1344 (Fed. Cir. 1998)......................................................................................3

*Schering Corp. v. Geneva Pharms.*,
　339 F.3d 1373 (Fed. Cir. 2003)......................................................................................11

*Typhoon Touch Tech. Inc. v. Dell Inc.*,
　659 F.3d 1376 (Fed. Cir. 2011)......................................................................................15

**Statutes**

35 U.S.C. §102..................................................................................................................4, 11

**Other Authorities**

Fed. R. Civ. P. 50(a) ........................................................................................................3

Fed. R. Civ. P. 59(a) ........................................................................................................3

# I.    <u>INTRODUCTION</u>

The Court should grant judgment as a matter of law ("JMOL") that (1) 2Wire does not

infringe asserted claims 17 and 18 of U.S. Patent No. 7,453,881 (the "'881 patent," JTX-0001)

and (2) the asserted claims are invalid as anticipated by the prior art.  TQ Delta failed to provide

substantial evidence to support the jury's verdict on these issues and, thus, JMOL is appropriate.

In the alternative, 2Wire requests a new trial on the issues of infringement and validity because

critical flaws in the jury instructions and certain evidentiary rulings prejudiced 2Wire, and

because the jury's verdict is against the clear weight of the evidence.

*First*, 2Wire is entitled to JMOL of non-infringement on claims 17 and 18 because TQ

Delta failed to adduce substantial evidence at trial that the accused 2Wire products "utiliz[e] at

least one transmission parameter value to reduce a difference in latency between the bonded

transceivers."  In putting on its case, TQ Delta contended that, by ███████████████

███████████ on two or more bonded lines, a difference in configuration latency is reduced

compared to what it "could have been."  But this theory was *pure speculation* because TQ Delta

offered no evidence to prove either (1) what the configuration latency "could have been" without

setting any constraints, or (2) that ██████████████████████ would result in any

reduction in configuration latency.  TQ Delta's reliance on speculation and made-up

hypotheticals from its experts cannot support a jury verdict of infringement.

*Second*, 2Wire is entitled to JMOL of invalidity because it presented clear and convincing

evidence that each limitation of claims 17 and 18 was disclosed by U.S. Patent No. 6,222,858 to

Counterman ("Counterman," JTX-0045).  In response, TQ Delta took issue with only a single

limitation and relied on arguments from its expert, Dr. Todor Cooklev, that ignored the key

portions of Counterman.  On anticipation, 2Wire carried its burden, and TQ Delta failed to

produce evidence in response, so 2Wire's motion for JMOL should be granted.

*Third*, 2Wire is entitled to a new trial because the Court's infringement instruction to the jury was erroneous.  By instructing the jury that it "must find that 2Wire's accused products infringe claim 17 and/or 18 regardless of how the accused products are actually used by 2Wire or its customers," the Court ignored the claim language requiring that the accused products *actually reduce* a configuration latency difference "utilizing" transmission parameters and improperly told the jury to ignore 2Wire's evidence that, when the accused products are configured and used by customers like AT&T, there is no difference in configuration latency to be reduced.  This instruction was prejudicial error and warrants a new trial.

*Fourth*, 2Wire was prejudiced at trial by a couple of the Court's rulings relating to the Patent Office's consideration of Counterman during prosecution of the '881 patent.  The Court first sustained TQ Delta's objections and prohibited 2Wire's expert, Dr. Krista Jacobsen, from testifying about the file history, which would have proven that the examiner never considered Counterman in the context of asserted claims 17 and 18.  As Dr. Jacobsen was prepared to testify, the applicant disclosed Counterman to the examiner on April 4, 2003, before claims 17 and 18 existed anywhere in the application.  Issued claims 17 and 18 were not added by the applicant until almost five years later, after the examiner's January 8, 2008 office action rejecting all claims.  The Court's evidentiary ruling left the door open for TQ Delta's counsel to argue—falsely—during closing arguments that Counterman "absolutely was considered" with respect to the asserted claims.  And without the benefit of Dr. Jacobsen's testimony, 2Wire was deprived of the opportunity to rebut that key argument to the jury.  2Wire objected and requested a curative instruction; the Court declined to give any curative instruction.  The Court's failure to issue a curative instruction prejudiced 2Wire and warrants granting a new trial.

*Fifth*, 2Wire also moves for a new trial on non-infringement of claim 17 and 18, and on anticipation based on Counterman of claims 17 and 18.  If the Court should find that 2Wire is not

entitled to JMOL on these grounds, 2Wire has shown that the verdict is against the clear weight of evidence.

## II.    <u>LEGAL STANDARD</u>

JMOL is required if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party." Fed. R. Civ. P. 50(a)(1).  "To prevail on a renewed motion for JMOL following a jury trial, a party 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998).

Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). Among the most common grounds for granting a new trial is when "the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice . . . ." *AVM Techs., LLC v. Intel Corp.*, 334 F. Supp. 3d 623, 626 (D. Del. 2018). "The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner." *Carrier Corp. v. Goodman Glob., Inc.*, 162 F. Supp. 3d 345, 351 (D. Del. 2016) (citations omitted).

Additionally, "[w]here a motion for a new trial is based on an alleged legal error in the jury instructions, the court must determine [(1)] 'whether an error was in fact committed, and (2) whether that error was so prejudicial that [the] denial of a new trial would be inconsistent with substantial justice.'" *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, No. CIV.A. 05-737-JJF, 2010 WL 3056617, at *2 (D. Del. July 30, 2010) (citation omitted).

III.     **NATURE AND STAGE OF THE PROCEEDING**

TQ Delta filed this patent infringement lawsuit against 2Wire on November 4, 2013,

asserting infringement of twenty-four patents.  *See* D.I. 1.  The Court split the case into separate

trials based on different families of patents.  *See*. D.I. 280 (Third Amended Scheduling Order).

The parties proceeded to trial on Family 2, at issue here, on two claims from a single patent,

claims 17 and 18 of the '881 patent, reproduced below:

> 17.  A plurality of bonded transceivers,
>
>> each bonded transceiver utilizing at least one transmission parameter value
>> to reduce a difference in latency between the bonded transceivers,
>>
>> wherein a data rate for a first of the bonded transceivers is different than a
>> data rate for a second of the bonded transceivers.
>
> 18.  The transceivers of claim 17, wherein the at least one transmission parameter
>> value is a Reed Solomon Coding parameter value, an interleaving
>> parameter value, a coding parameter value, a codeword size value or a
>> framing parameter value.

By the beginning of trial on January 13, 2020, the remaining accused products were

2Wire's 5168N, 5168NV, and 5268AC products.  All of these accused products use the same

DSL chip from Broadcom, the BCM 63x68.  The jury returned a verdict on January 16, 2020,

finding that claims 17 and 18 were infringed by each of the accused 2Wire products and that

claims 17 and 18 were not anticipated by Counterman under 35 U.S.C. §102.

IV.     **ARGUMENT**

A.     **The Court Should Enter JMOL That 2Wire Does Not Infringe the Asserted
Claims.**

The Court should enter JMOL of non-infringement in 2Wire's favor because, on the

evidence presented at trial, no reasonable jury could find that the accused products satisfy the

limitation of "utilizing at least one transmission parameter value to reduce a difference in latency

between the bonded transceivers," as required for claims 17 and 18 of the '881 patent.  "In order

to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  At trial, TQ Delta did not point to any specific instances of direct infringement, nor did it establish that the accused 2Wire products necessarily infringe claims 17 and 18.

TQ Delta made no attempt to present any evidence of an actual reduction in differential latency.  Instead, TQ Delta argued that this limitation is satisfied because, ███████████ ██████████████████████████████████ on each bonded line (███████ and ███████), the differential latency between two lines is necessarily constrained to something less than what it "could have been" if ███████████████████. *See, e.g.*, Trial Tr., at p. 319:5–8 (Dr. Cooklev: "The difference in latency is actually reduced so we have an actual reduction compared to what the difference in latency could have been if there wasn't a latency constraint on each line.").  This argument fails, however, because TQ Delta failed to produce any evidence at all as to what latencies the accused 2Wire products could possibly initialize to if ███████ ███████████████████ and, thus, no evidence of what the differential latency "could have been."  TQ Delta thus failed to present evidence on this limitation to support the jury's verdict of infringement.[1]

<u>Dr. Cooklev's testimony does not support the jury's verdict.</u>  Through Dr. Cooklev, the only "evidence" that TQ Delta presented of any purported reduction in differential latency between bonded transceivers had nothing to do with the accused products, or with the

---

[1] It was undisputed at trial that DSL transceivers always have been bounded by a maximum latency constraint.  *See, e.g.*, Trial Tr., at pp. 174:13–178:10 (Mr. Tzannes admitting that maximum delay constraints existed prior to his invention); DTX0564_0035 (G.997.1 standard, from June 1999, specifying maximum line delay at sections 7.3.8 and 7.3.9); DTX0565_0026 (G.994.1 standard, from June 1999, specifying maximum latency upstream and downstream in Tables 9-c.1 and 9-d.1).  And TQ Delta presented no evidence that the minDelay constraint is anything other than zero.

transmission parameters or latency values for them at initialization.  Instead, Dr. Cooklev

discussed a hypothetical comparison between an Example A (which used parameters from the

'881 patent, and not any of the accused products) and an Example B (which, according to Dr.

Cooklev, "illustrates what the difference in latency could have been if there wasn't a constraint"

on each line).  Trial Tr., at p. 319:14–15.  Dr. Cooklev's examples are below:

## Calculating Latency
### Varying the Transmission Parameters Affecting Latency

$$Latency = \frac{N \times D}{R}$$

N → codeword size
D → interleaver depth
R → data rate

| | EXAMPLE A<br>Reducing difference in latency to zero | | EXAMPLE B<br>What it could have been but for the invention | |
|---|---|---|---|---|
| | Line 1 | Line 2 | Line 1 | Line 2 |
| Latency Constraint | Each line constrained to 16 ms | | No constraint on latency of each line | |
| N | 1600 bits | 1600 bits | 1600 bits | 1600 bits |
| D | 64 | 16 | 32 | 16 |
| R | 6.4 Mb/s | 1.6 Mb/s | 6.4 Mb/s | 1.6 Mb/s |
| Latency | 16 ms | 16 ms | 8 ms | 16 ms |
| Difference in Latency | 16 ms – 16 ms = 0 ms | | 16 ms – 8 ms = 8 ms | |

PTX-0901, at p. 20.

But Dr. Cooklev's Example B cannot be evidence of infringement by the accused 2Wire

products because, as Dr. Cooklev himself admitted, this "hypothetical example" does not exist

and would never exist anywhere in the real world—and certainly not in 2Wire's accused

products:

> Q.  So when does this constraint happen?  In other words, when is the constraint
> applied?
>
> A.  This constraint is applied at the first instance.  The constraint is applied when
> each line calculates the transmission parameters, the transmission parameter
> values.
>
> ***Q.  So does that mean that the higher difference in latency in your Example B
> will never exist?***

> *A.   Well, that's -- that is correct.   That is correct.   Example B shows what it could have been if the invention is not practiced.   So it is a hypothetical example.   It doesn't exist in practice.*

Trial Tr., at p. 320:7–17 (emphasis added).  Instead, the numbers that Dr. Cooklev used were completely made up, and he could have used any combination of unrealistic numbers to solve for his predetermined conclusion:

> Q.  I just want to make sure I understand.  The numbers in Example B, those came from your head; correct?
>
> A.  That's correct.
>
> Q.  And you could have selected from your head different numbers; correct?
>
> A.  I could have selected different numbers.  Yes.
>
> Q.   And if you had selected different numbers, you might have gotten different results; correct?
>
> A.  That's correct.
>
> Q.   So you selected numbers to illustrate a point that you were trying to make; correct?
>
> A.  That's correct.

*Id.*, at pp. 382:25–383:11.

In other words, TQ Delta could not possibly establish that the accused products "utiliz[e] at least one transmission parameter value to reduce a difference in latency between the bonded transceivers" because TQ Delta failed to present any evidence of what the differential latency "could have been" in the accused products absent ███████████████████████████ ████████.  Without evidence of what the differential latency "could have been," TQ Delta could not—and did not—prove that a difference in latency is ever reduced, as required by the claims.  Certainly Dr. Cooklev's mere hypothetical cannot carry TQ Delta's burden of "either point[ing] to specific instances of direct infringement or show[ing] that the accused device necessarily infringes the patent in suit."  *ACCO Brands*, 501 F.3d at 1313.

<u>Dr. Almeroth's testimony does not support the jury's verdict.</u>  TQ Delta's source code

expert, Dr. Kevin Almeroth, also did not provide any testimony at trial demonstrating that the

accused 2Wire products "utiliz[e] at least one transmission parameter value to reduce a

difference in latency between the bonded transceivers."  According to Dr. Almeroth, because the

Broadcom source code that he reviewed █████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████, then the differential latency between the two bonded lines would

necessarily be reduced as well:

> It doesn't need to calculate that value because there's other techniques to ██████
> ████████ in ██████.  You could almost use what's I guess now the Court
> Exhibit A.  And so you have ██████ on one end, and you have ██████ on
> the other.  And as the source code shows, you ████████████████ of ██████
> and ██ those ████████████.  What that does is where you could have had
> a delay of ████ and a delay of ████, but now you've ████████████, so one
> can ████████. It has to be in a ████████. Now, it goes from ████████
> and ██ to ████ and ████ or ████ and ████. You've ████████ the ████████ in
> the ████.

Trial Tr., at p. 489:10–22; *see also id.*, at p. 478:2–7 (Dr. Almeroth: "What I'm relying on is the

████████ the ████████ to ████████ between the ██████ and the ██████ and then

██████ that ████ and ████ in the ████████ of the ████████████, I think that's

certainly what relates to the claims.").

However, TQ Delta failed to present any evidence supporting Dr. Almeroth's assertion

that using "██████" ████████ and ████████ constraints would actually result in a ██████

████████████ in any of the accused 2Wire products.  The problem here is similar to the

problem with Dr. Cooklev's theory:  without any evidence of what the differential latency "could

have been," Dr. Almeroth cannot and did not say that ████████████████████████████

actually reduces differential latency at all.  In other words, Dr. Almeroth could not and did not

say that the *actual* latency on either of the bonded lines, or any *actual* difference in latency

between bonded lines, would ever have been  TQ Delta presented no evidence that the ████████████████████████ would have any effect whatsoever on reducing differential latency.

Had TQ Delta been able to prove or demonstrate any actual reduction in differential latency, such as through Dr. Cooklev's testing of the accused products, it would have presented such evidence at trial. TQ Delta did not do so and instead was left with Dr. Cooklev's hypothetical Example B that does not exist in the real world. Moreover, even accepting Dr. Almeroth's assertion that ██████████████████████████████████, Dr. Almeroth admitted that it is entirely possible that the actual difference in latency between the bonded lines (if any) could remain the same:

Q. Let's do a scenario three. So this time we're increasing ███████ to ██

A. Understood.

**Q. Okay. We've ████████████████, but you would agree with me that that could have no effect on the ████████████ after you ████████████ for ██ of ████████; isn't that right?**

**A. That's true in some scenarios the results might end up being the same.** But you haven't really accounted for in any of these hypothetically is what the ████████ the ████████ would do in terms of ████████████████ of what ████████ could be.

Trial Tr., at p. 480:1–12 (emphasis added). Under such circumstances, because the differential delay is the same in both scenarios, there is no reduction in differential latency as required by the claims. Notably, the scenario that Dr. Almeroth admitted could exist is precisely what Dr. Jacobsen's tests of the accused products showed, *i.e.*, that the differential delay between two lines is always zero. *See* Trial Tr., at pp. 613:16–624:14; DDX0005-19 & 20 (tables from Dr. Jacobsen's test results).

*TQ Delta never provided any evidence of any differential latency at all in the accused products. This is a critical failure of proof. To prove a reduction in a difference in latency between bonded transceivers, as required by the claims, TQ Delta had to prove that there was a difference in latency in the first place. There was no evidence at trial that the difference in latency "could have been" anything other than zero, because that is what Dr. Jacobsen's tests showed and TQ Delta presented no contrary evidence.*

<u>The Ubermatrix does not support the jury's verdict.</u>  TQ Delta and Dr. Cooklev also relied on the Ubermatrix—a requirements document between 2Wire and AT&T—to argue that the accused products utilize at least one transmission parameter value to reduce a difference in latency between the bonded transceivers.  Specifically, TQ Delta relied upon row 451 of the Ubermatrix, which states: "█████████████████████████

███."  JTX-0029.0039, at row 451; *see also* Trial Tr., at pp. 343:11–344:16.  This document is not sufficient evidence to support the verdict.  Even assuming "interleaving delay" is the same as "configuration delay" as required for the asserted claims (which 2Wire disputes, *see* Trial Tr., at pp. 626:12–627:2), this row in the Ubermatrix at most simply demonstrates the same, undisputed point discussed above—in the accused products, the differential latency between two lines is zero.  Therefore, this snippet from the Ubermatrix is not sufficient evidence to support the jury's infringement verdict.

*     *     *

In sum, TQ Delta's infringement theory fails as a matter of law.  Proving a reduction in a *range of potential latency* across two or more bonded lines—even assuming, solely for purposes of argument, that TQ Delta actually proved that much—is not the same thing, without more, as proving an actual reduction in a difference in latency utilizing transmission parameters.  Accordingly, no reasonable jury could conclude that the accused products satisfy the limitation

10

of "utilizing at least one transmission parameter value to reduce a difference in latency between the bonded transceivers," and, therefore, 2Wire is entitled to judgment of non-infringement as a matter of law.

    **B.**    **The Court Should Enter JMOL That The Asserted Claims Are Invalid As Anticipated By Counterman.**

The Court should enter JMOL that the asserted claims are invalid as anticipated by Counterman under 35 U.S.C. § 102.  A claim is invalid for anticipation "if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Anticipation must be shown by clear and convincing evidence.  *See Orion IP, LLC v. Hyundai Motor Amer.*, 605 F.3d 967, 975 (Fed. Cir. 2010) (overturning denial of JMOL and granting JMOL of invalidity).  TQ Delta does not dispute that the first and third limitations of claim 17 are met by Counterman, or that Counterman discloses using the transmission parameters recited in claim 18.  With respect to the second limitation—"each bonded transceiver utilizing at least one transmission parameter value to reduce a difference in latency between the bonded transceivers"—2Wire presented clear and convincing evidence that this limitation was met, while TQ Delta presented no evidence at all.  JMOL of anticipation in view of Counterman should be entered.  *See, e.g.*, *Orion IP*, 605 F.3d at 975–76; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252–55 (Fed. Cir. 2014) (reversing district court and granting JMOL where jury's conclusion of no anticipation was not supported by substantial evidence); *cf. Dystar Textilfarben GmbH & Co. Deutschland KG v. CH Patrick & Co.*, 464 F.3d 1356, 1361–62 (Fed. Cir. 2006) (overturning district court's denial of JMOL on obviousness where the jury had credited evidence of the wrong level of ordinary skill in the art).

First, there is no dispute that the first element of claim 17—a plurality of bonded transceivers—is disclosed by Counterman. Dr. Jacobsen testified that Counterman discloses transceivers that use inverse multiplexing to combine transceivers into inverse multiplexing groups. Trial Tr., at pp. 636:4–637:18. TQ Delta's expert, Dr. Cooklev, presented no evidence to the contrary, and admitted that Counterman discloses this limitation. *Id.*, at p. 701:17–20 ("Q. So can we agree that Counterman discloses a plurality of bonded transceivers? A. Counterman talks about service flows, but we can agree that that relates to bonded transceiver.").

As to the second element of claim 17—"each bonded transceiver utilizing at least one transmission parameter value to reduce a difference in latency between the bonded transceivers"—2Wire presented clear and convincing evidence that this limitation is disclosed by Counterman. As Dr. Jacobsen explained, Counterman discloses controlling the difference in delay between grouped communication links (*i.e.*, bonded lines, *see* Trial Tr., at p. 633:7–23) by selecting certain FEC parameters to meet a quality of service objective:

> And the key part here is that Counterman says that the delay that's experienced by a cell is the result of selecting certain forward error correction or FEC parameters in order to meet the common desired quality of service objective. So what this is saying is you control the delay by selecting certain FEC parameters to meet whatever your quality of service requirement is, which is includes whatever delay you're looking to meet.

Trial Tr., at pp. 640:5–12 (discussing Counterman, at col. 6:8–13). Dr. Jacobsen further explained that this element is met because Counterman "select[s] those [transmission parameters] to set a delay and then you're able to bond together these connections or these links because they have -- you've reduced the difference in latency between them, so you're able to bond them." Trial Tr., pp. 640:13–641:1 (discussing Counterman, at col. 7:6–13).

TQ Delta failed to present any evidence in response to 2Wire's showing that this claim limitation was met. Dr. Cooklev testified that Counterman does not meet this limitation because

it merely groups connections with similar delays.  *See id.*, at pp. 694:24–695:23.  His testimony, however, ignores the portions of Counterman that disclose selecting parameters to meet a common service objective, such as reduced delay.  With respect to those sections of Counterman, he agreed with Dr. Jacobsen's interpretation.  *See id.*, at pp. 705:13–708:20.  Dr. Cooklev admitted that Counterman disclosed that an FEC parameter was a transmission parameter:

> Q.  In fact, in addition to disclosing the use of FEC parameters, so can we agree that FEC parameters are transmission parameters?
>
> A.  FEC parameters are transmission parameters.

*Id.*, at p. 707:1–4.  Dr. Cooklev further admitted that Counterman selected FEC parameters to meet a common quality of service objective:

> Q.  So you appreciate Counterman discloses selecting certain FEC parameters in order to of meet a desired, common quality of service objective, correct?
>
> A.  Yes.

*Id.*, at p. 708:15–18; *see also id.*, at p. 706:4–6.  Finally, Dr. Cooklev admitted that one of those objectives is "low delay":

> Q.  And that might be low delay, correct?
>
> A.  Correct.

*Id.*, at p. 708:19–20; *see also id.*, at p. 706:7–9.  In this way, Dr. Cooklev admitted that Counterman utilizes transmission parameter values to reduce a difference in latency. Counterman selects transmission parameters to meet the common objective of "low delay" across multiple bonded lines.  In that way, the difference in configuration latency is reduced.

There also is no dispute that Counterman discloses the third limitation of claim 17— "wherein a data rate for a first of the bonded transceivers is different than a data rate for a second of the bonded transceivers."  Dr. Jacobsen explained at trial that Counterman describes grouping communication links that have different transmission rates, or data rates.  Trial Tr., at pp. 641:8–

13

642:18 (discussing Counterman, at Abstract, col. 5:20–23, col. 5:8–13).  Again, Dr. Cooklev presented no evidence to the contrary, and admitted that Counterman discloses this limitation. *Id.*, at pp. 701:22–702:4 ("And then similarly, element B of claim 17, 'wherein a data rate for a first of the bonded transceivers is different than a data rate for a second of the bonded transceivers,' that's blank in your chart; correct?  A.  That's correct.  Q.  So I assume we can agree that Counterman discloses that element?  A.  We can agree about that.").

Finally, there is no dispute that Counterman discloses the additional limitation of claim 18, that the "at least one transmission parameter value is a Reed Solomon coding parameter value, an interleaving parameter value, a coding parameter value, a codeword size value, or a framing parameter value."  Dr. Jacobsen testified that Counterman uses forward error correction to set a delay to meet a quality of service objective.  *See* Trial Tr., at p. 643:10–18; Counterman, at col. 3:35–48, col. 6:8–12.  She further testified that the type of forward error correction used in DSL (and in Counterman) is Reed-Solomon coding, which uses Reed-Solomon coding parameters, and that each limitation of claim 18 is disclosed by Counterman.  *See* Trial Tr., at pp. 643:18–645:15.  Dr. Cooklev agreed, and admitted that Counterman disclosed forward error correction parameters, which included Reed-Solomon coding parameters, and that those parameters could be used to meet a quality of service objective such as "low delay."  *Id.*, at pp. 706:4–707:4.  In this way, the jury's verdict of no anticipation based on Counterman is not supported by substantial evidence, and 2Wire's motion for JMOL should be granted.

## C.  In The Alternative, The Court Should Grant 2Wire A New Trial.

Should the Court deny 2Wire's JMOL, it should nevertheless grant 2Wire a new trial because the Court erred in certain of its rulings on jury instructions and evidentiary objections, which substantially prejudiced 2Wire's right to a fair trial.  2Wire also requests a new trial because the jury's verdict is against the clear weight of the evidence.

14

### 1.    The Court's Jury Instruction on Infringement was in Error and Warrants a New Trial.

The Court erred in giving the following jury instruction on infringement:

> Claims 17 and 18 of the '881 patent are apparatus claims.  An apparatus claim covers what a device is, not what a device does.  If you find that TQ Delta has demonstrated any of 2Wire's accused products infringe claims 17 and/or 18, then you must find that 2Wire's accused products infringe claims 17 and/or 18 regardless of how the accused products are actually used by 2Wire or its customers.

Trial Tr., at p. 772:1–8.

To determine whether a new trial is warranted based on this instruction, the Court must determine (1) whether an error was in fact committed and (2) whether that error was so prejudicial to 2Wire that the denial of a new trial would be inconsistent with substantial justice. *Dow Chem.*, 2010 WL 3056617, at *2.  Both prongs are satisfied here.

As to the first prong, the infringement jury instruction is legally erroneous for two reasons.  First, the Court's jury instruction was erroneous because it conflicts with the plain language of the claims, which uses the gerund "utilizing" as to "each bonded transceiver."  Given this "utilizing" claim language, for TQ Delta to establish infringement, it was required to prove that "each bonded transceiver" actually utilizes "a transmission parameter to reduce a difference in latency between the bonded transceivers."  *See, e.g.*, *Typhoon Touch Tech. Inc. v. Dell Inc.*, 659 F.3d 1376, 1380–81 (Fed. Cir. 2011) (upholding district court's claim construction that required a memory to actually perform a function recited using gerund "storing").  The Court's jury instruction read this requirement out entirely, and, as the Court is aware, TQ Delta presented no actual evidence of any "bonded transceiver" in any accused 2Wire product ever "utilizing a transmission parameter value to reduce a difference in latency between the bonded transceivers."  The jury instruction thus permitted the jury to find infringement in a manner contradictory to the language of the asserted claims.

15

Second, the jury instruction contradicts the Court's earlier order that permitted 2Wire "to argue that infringement of the claim element is not shown because there is no evidence of an actual reduction in the difference of configuration latency . . . ." D.I. 1105, at p. 2. 2Wire proved this at trial, including through the testimony of Dr. Jacobsen regarding her testing of the accused products, which showed no difference in latency between bonded transceivers when the products are configured according to real-world customer service profiles. TQ Delta presented no conflicting evidence on this point. But then the Court's infringement instruction told the jury to disregard this evidence. The instruction told the jury to find infringement "regardless of how the accused products are actually used by 2Wire or its customers." Trial Tr., at p. 772:6–8. In other words, under the Court's infringement instruction, the jury was told to find infringement even where TQ Delta failed to prove any actual reduction in configuration latency utilizing transmission parameters. The infringement instruction was legally erroneous.

As to the second prong, the erroneous jury instruction was so prejudicial to 2Wire that the denial of a new trial would be inconsistent with substantial justice. The infringement jury instruction effectively lowered TQ Delta's burden of proof by permitting the jury to find infringement in a way that is inconsistent with the plain language of the claims as well as the Court's prior order that 2Wire could argue there was no actual reduction in a difference in latency. The portion of the Court's instruction to the jury that "you must find that 2Wire's accused products infringe claims 17 and/or 18 regardless of how the accused products are actually used by 2Wire or its customers" effectively eliminated the requirement in the claims that each bonded transceiver actually utilize a transmission parameter to reduce a difference in latency between the bonded transceivers. The Court should therefore grant 2Wire a new trial on the issue of infringement.

**2.** **The Court's Ruling on the Consideration of Counterman During Prosecution Was Prejudicial Error Warranting a New Trial.**

2Wire also was prejudiced by the Court's rulings on the evidence and argument that the parties could present regarding the Patent Office's consideration of the Counterman reference during prosecution.  The Court's rulings—which forbade 2Wire's expert Dr. Jacobsen from explaining how the Examiner considered Counterman in view of different claims during prosecution (Trial Tr., at p. 282:8–12), but allowed TQ Delta to say Counterman "absolutely was considered" in relation to the asserted claims during prosecution (*id.*, at pp. 795:3–5, 800:17–20)—prejudiced 2Wire and warrant a new trial.

2Wire sought to present evidence that, even though Counterman appeared on the face of the '881 patent, Counterman was considered in view of different claims than those that eventually issued—and, in particular, *not* in view of asserted claims 17 and 18.  In particular, consistent with her expert report, Dr. Jacobsen was prepared to testify regarding the file history as follows:  (1) on October 4, 2002, the applicant filed the '881 patent application, which did not include either claim 17 or 18 as issued; (2) on April 4, 2003, the applicant submitted an information disclosure statement (IDS) listing three patents, including Counterman; (3) on October 8, 2006, April 27, 2007, and January 8, 2008, the patent examiner issued a number of rejections under 35 U.S.C. §§ 103 and 112 over the pending claims, which still did not include asserted claims 17 and 18; and (4) it was not until after the last rejection that the applicant amended then-pending claims 29 and 30 to recite "a plurality of bonded transceivers" that the examiner allowed the claims to issue as asserted claims 17 and 18.  *See* Opening Expert Report of Dr. Krista S. Jacobsen ¶¶ 107–115.  In short, based on the file history, asserted claims 17 and 18 were never considered by the examiner in view of Counterman.

The Court sustained TQ Delta's objections to Dr. Jacobsen's demonstratives and

testimony on this subject.  Trial Tr., at p. 282:8–12.  Then, during TQ Delta's closing argument,

its counsel falsely stated that Counterman "absolutely was considered" by the examiner during

prosecution of the '881 patent, and "the patent examiner of course concluded that [the inventors

had invented something] by granting these claims."  *Id*., at p. 795:3–5, 11–12.  2Wire objected

and asked for a curative instruction because, as set forth above, there was no evidence that the

examiner considered Counterman in connection with the claims that became asserted claims 17

and 18 of the '881 patent.  As 2Wire's counsel explained to the Court at sidebar:

> And that's what the evidence was going to be is that Counterman was provided in
> an IDS, Information Disclosure Statement, and then all of the claims were
> abandoned and this new claim set was provided that included what claim 17 and
> 18, and there's nothing in the file that Counterman was considered after that.  So
> that was what the evidence was going to be.

Trial Tr., at p. 803:5–11.  The Court declined to provide a curative instruction.  *Id*., at p. 805:7–8.

The Court's rulings prejudiced 2Wire twice:  first, by preventing 2Wire from presenting

evidence that the Patent Office failed to consider Counterman in connection with the asserted

claims, and second, by allowing TQ Delta's counsel to falsely tell the jury during closing

arguments that Counterman was "absolutely" considered by the examiner in connection with the

asserted claims.  The prejudice here is clear:  without the evidence that 2Wire was prevented

from presenting, TQ Delta's counsel was allowed to falsely tell the jury that it should not

second-guess the patent examiner who already considered and allowed claims 17 and 18 over

Counterman.  Excluding Dr. Jacobsen's expert testimony on the file history deprived 2Wire of

the ability to rebut the falsity offered by TQ Delta.  The Court should therefore grant 2Wire a

new trial on the issue of invalidity.

### 3.   The Court Should Grant a New Trial on Infringement and Invalidity Because the Jury's Verdict Is Against the Clear Weight of the Evidence.

2Wire respectfully requests a new trial on the issues of infringement and invalidity

because, even if the infringement and invalidity issues above do not justify JMOL, the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice. *See AVM Techs.*, 334 F. Supp. 3d at 626. In determining whether to grant a new trial, the Court "should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 798 F. Supp. 2d 541, 558 (D. Del. 2011).

On the issue of infringement, a new trial is warranted because TQ Delta and its experts failed to present any evidence relating to whether the accused 2Wire products satisfy the limitation of "utilizing a transmission parameter to reduce a difference in latency between the bonded transceivers." Dr. Cooklev testified about a purported reduction in differential latency between his Example A and Example B, but neither of those examples had anything to do with the accused 2Wire products. In fact, Dr. Cooklev testified that his Example B was completely "hypothetical" and would never "exist in practice." Such speculation from Dr. Cooklev could not support the jury's infringement verdict. Similarly, Dr. Almeroth provided no evidence that the accused products reduce a difference in latency. At most, Dr. Almeroth testified that ███

████████████████████████████████████████████████████████

██████. However, he provided no evidence that ████████████████████████████ would *ever* reduce any actual difference in latency between bonded lines. To the contrary, he admitted on cross-examination that the differential latency between lines could remain exactly the same before and after ██████████████. Trial Tr., at p. 480:1–12. Given this record, the jury's finding of infringement was against the clear weight of the evidence.

On the issue of invalidity, the Court should grant a new trial because the jury's finding that Counterman does not anticipate claims 17 and 18 of the '881 patent was against the clear weight of the evidence. As discussed above, the only disputed claim limitation with respect to

Counterman was "utilizing a transmission parameter to reduce a difference in latency between the bonded transceivers" from claim 17; Dr. Cooklev agreed that all other limitations from the asserted claims were disclosed by Counterman.  Even as to the "utilizing" limitation, however, Dr. Cooklev ultimately agreed with Dr. Jacobsen's interpretation of Counterman and, thus, conceded that Counterman anticipates the asserted claims.  In particular, Dr. Cooklev admitted that Counterman disclosed the use of FEC parameters to meet a common quality of service objective, such as low delay, resulting in a reduction in differential latency among the grouped lines in Counterman, as required for claim 17.  Therefore, on this record, the jury should have concluded that the asserted claims are invalid, and a new trial is required "to prevent a miscarriage of justice."

## V.     **CONCLUSION**

For the foregoing reasons, 2Wire respectfully requests that the Court enter judgment as a matter of law in 2Wire's favor as to non-infringement and invalidity of the asserted claims.  In the alternative, the Court should grant 2Wire a new trial on the same issues.

Respectfully submitted,

/s/ Jody C. Barillare
Jody C. Barillare (#5107)
MORGAN LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street, Suite 501
Wilmington, Delaware 19801
Telephone:  302.574.3000
jody.barillare@morganlewis.com

*Attorneys for Defendant 2Wire, Inc.*

OF COUNSEL:
Brett Schuman (*pro hac vice*)
Rachel M. Walsh (*pro hac vice*)
GOODWIN PROCTER LLP
Three Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone:  415.733.6000

Douglas J. Kline (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Masachusetts 02210
Telephone:  617.570.1000

Andrew S. Ong (*pro hac vice*)
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
Telephone:  650.752.3100

Cindy Chang (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, New York 10018
Telephone:  212.813.8800

Dated:  February 14, 2020